UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD LOESEL, ARTHUR
LOESEL,

               Plaintiffs,

                                         Case Number 08-11131-BC

v.                                     Honorable Thomas L. Ludington

CITY OF FRANKENMUTH,

               Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR TO DISMISS

Plaintiffs Ronald and Arthur Loesel filed a complaint against Defendant City of Frankenmuth on March 17, 2008. Plaintiffs are owners of a tract of land on the outskirts of Frankenmuth. They entered into an option agreement with Wal-Mart for Wal-Mart to purchase the land for four-million dollars if it could build one of its stores on the land. Defendant learned of the contract, became concerned about the impact that a Wal-Mart and other similar stores would have on Defendant, and eventually adopted a zoning ordinance, which may have precluded Wal-Mart from building one of its stores on Plaintiffs' property. Wal-Mart abandoned its application to build a store on Plaintiffs' property and terminated the option contract with Plaintiffs. Plaintiffs' complaint alleges claims against Defendant City of Frankenmuth based on equal protection, due process, the Privilege and Immunities Clause of the Fourteenth Amendment, and the Commerce Clause. Plaintiff seeks both monetary damages and an order declaring that Defendant's zoning ordinance is unconstitutional.

Now before the Court is Defendant's motion to dismiss and for summary judgment [Dkt. # 13], filed August 28, 2008. Plaintiff filed a response [Dkt. # 18] on October 14, 2008, and

Defendant filed a reply [Dkt. # 21] on November 26, 2008. The Court held a hearing on December 10, 2008. Defendant first contends that the Court should dismiss all of Plaintiffs' claims for lack of jurisdiction because Plaintiffs lack standing. Second, Defendant contends that the Court should dismiss Plaintiffs' equal protection and due process claims for lack of jurisdiction because those claims are not ripe. Third, Defendant argues that it is entitled to summary judgment on all of Plaintiffs' claims based on the merits. Plaintiffs argue that they have standing and that their claims are ripe. To the extent that Defendant moves for summary judgment on the merits of Plaintiffs' claims, Plaintiffs oppose the motion because more discovery is necessary under Federal Rule of Civil Procedure 56(f).

I

The following facts are as alleged by Plaintiffs, unless otherwise noted:

Plaintiffs at all relevant times were and continue to be tenants in common in approximately thirty-seven acres of land located in the Township of Frankenmuth, Saginaw County, Michigan. Plaintiffs' property is located in the Township of Frankenmuth, contiguous with Defendant. Many of Defendant's citizens have a German heritage, and Defendant has promoted itself as "Michigan's Little Bavaria." Defendant profits from an influx of day and overnight tourists to Main Street, which emphasizes retail and restaurant establishments with a Bavarian theme. One of these establishments, Bronner's, is a retail store specializing in Christmas ornaments and other merchandise, is approximately 400,000 square feet, and has over one-hundred employees. Nearby, other establishments serve fried-chicken dinners and sell souvenirs to tourists. All of the Bavarian-themed establishments are located in the southern end of Defendant, generally south of Genesee Street.

The northern part of Defendant abuts the Township of Frankenmuth. The north end of town

contains the non-tourist retail properties used by Defendant's residents, including banks, car dealerships, and grocers. A prominent shopping center, the Bavarian Mall, contains a number of retail stores and is located just north of Genesee Street. The northern part of Defendant is described in its Master Growth Plan as follows:

> Serving as the center of local commerce for an area much larger than the township, the North Main Street local shopping area is also the gateway to the South Main tourist business district in Frankenmuth. Main Street is multifunctional and services a combination of pedestrian and automobile traffic. Main Street is also state trunkline —83 and serves as the main point of ingress from the Birch Run exit at I-75.

According to Defendant, its Zoning and Planning Code designates two commercial planned unit development districts, consisting of only undeveloped land: Commercial Local-Planned Use Development ("CL-PUD") and Commercial Tourist Planned Use Development ("CT-PUD"). Plaintiffs' property is zoned CL-PUD. The CL-PUD districts provide for the sale of goods and services to meet the general needs of the residents of Defendant. The CT-PUD districts are those which provide for the sale of goods and services to meet the general needs of visitors. According to Defendant's Master Growth Plan, the zoning was designed to encourage innovation in land use and variety in design, layout, and type of structures constructed. Prior to the adoption of the ordinance at issue in this case, Defendant did not have any zoning ordinances imposing a size limit on structures. Defendant did, however, have minimum lot size restrictions in order to discourage structures being placed too close to one another.

The commercial establishments north of Main Street typically do not incorporate the Bavarian look. The north end of town is typically a mixed-zone of commercial and residential use properties. As zoned prior to the events that led to this lawsuit, Plaintiffs' property was contiguous to other commercially-zoned properties. Defendant had planned that commercial expansion would

likely occur in the direction of Plaintiffs' property, that is, northward of the north-south commercial corridor.

At least as early as in 1996, the Township of Frankenmuth and Defendant, through resolutions and agreements, agreed that Defendant would furnish water and sewer services to, among others, Plaintiffs' property, with the tract to be annexed by Defendant if requested by a developer. As a result of these resolutions and agreements, at all times relevant to this lawsuit, the future development of Plaintiffs' property has been under the actual zoning control of Defendant.

On May 26, 2005, Plaintiffs and third-party Wal-Mart Real Estate Business Trust entered into an option agreement for Plaintiffs to sell and Wal-Mart to purchase a portion of Plaintiffs' land. The option agreement was later amended to expand the original purchase of the land from approximately 23.55 acres to approximately 37 acres. The amended option agreement between Wal-Mart and Plaintiffs called for Wal-Mart to pay Plaintiffs $4,000,000.00 for the property, contingent on Wal-Mart's ability to actually build the store.

A review of the agreement also reveals that Wal-Mart maintained "sole and absolute discretion" to cancel the agreement within 180 days of the date of the agreement based on "the feasibility of Wal-Mart's planned development of the Property." The purchase was also contingent on the outcome of an environmental investigation conducted by Wal-Mart, which it had 270 days to complete. Finally, the agreement expressly conditioned the agreement on "zoning of the Property for business retail usage."

On March 29, 2005, upon hearing a rumor that Plaintiffs were talking to Wal-Mart, Defendant's City Manager Charles Graham emailed a planner acquaintance at the Michigan Department of Transportation ("MDOT") stating that "[City Clerk] Phil Kerns has now confirmed

there will be a meeting here on April 7th pertaining to the Loesel property on North Main."  The next day, Graham emailed the planner at MDOT and said, "We have heard rumors that the proposed project is a Walmart which I am totally opposed to, and I think most people in Frankenmuth will be opposed to."  However, Graham acknowledged that Plaintiffs' property was properly commercially zoned and that as a consequence, absent action by Defendant, Plaintiffs had a right to sell the property to Wal-Mart for a store to be built in the northern end of town.

At a point after Plaintiffs had signed the agreement with Wal-Mart, Graham began to solicit information concerning other communities' efforts to exclude Wal-Mart from their towns.  On June 22, 2005, in response to an email he sent requesting assistance on how to oppose the Wal-Mart, Graham was told that Defendant could, "[a]dd a provision to the zoning ordinance that limits the size of any commercial building.  That will stop them from enlarging and may stop them from beginning if they know they cannot enlarge."  In the same email, Graham was advised: "Be sure to do a good internet search first because WalMart has challenged some of those provisions and won when they were poorly drafted, but lost when they weren't, if I recall correctly."  Graham was further advised: "It is definitely better for citizens to fight it instead of the city and township."

On July 14, 2005, Graham attended a meeting of the Frankenmuth Economic Development Corporation ("EDC").  At the meeting Graham acknowledged that he had reviewed the proposed site plan submitted by Wal-Mart's engineers, and admitted that, as shown, it appeared that the zoning allowed the proposed project.  The EDC estimated that the Wal-Mart store would generate between $40,000 and $50,000 in annual tax revenue for Defendant, which would have added an additional two-percent to Defendant's annual property tax revenue, with total tax revenue for the county and schools amounting to between $200,000 and $250,000.

-5-

The Frankenmuth Downtown Development Authority ("DDA") was established by Defendant in 1983 to promote economic growth.  Its board is appointed by the Mayor of Frankenmuth, and the DDA is a city organization.  On July 15, 2005, Sheila Stamiris, Executive Director of the DDA, sent a memorandum to the Frankenmuth Mayor and City Council.  She advised Defendant's Mayor and the City Council that Plaintiffs had been offered a large sum of money by Wal-Mart for their land.  She said:

> Tuesday we awkwardly discussed the proposed Walmart project.  As I already suggested, we have not brought the discussion to the public agenda.  If there is anything good to say about the project, we can say that we have been given a heads up by the owner and perhaps we have been given a gift of time to adequately plan for this controversial project.  I feel strongly that the City should remain neutral while fact finding is completed.

Stamiris expressly advised Defendant that the proposed store was a 104,000 square-foot super-center including sundry and drygoods, a grocery, a pharmacy, and a tire center.  Stamiris identified the precise location of the proposed store.  Shortly after writing the memorandum, Stamiris advised Graham and other of Defendant's officials that other Michigan towns had not experienced problems with Wal-Mart stores.  She forwarded an email from the Downtown Development Authority of DeWitt, Michigan, a town roughly the same size as Defendant, that said in response to her inquiry:

> We have three Wal-Marts within a twenty mile radius.  To this point we have not noticed that specifically, Wal-Mart has negatively impacted our downtown.  We recently lost a dollar store, but am not sure it could be contributed to the opening of a Wal-Mart.  It seems that folks in this area are of the opinion that shoppers will go where they can get the best deal and Wal-Mart has good deals.  We feel that the Big Box stores offering one stop shopping appeal to younger shoppers with convenience as their goal.

Stamiris also forwarded to Defendant an Economic Impact Report that estimated the new Wal-Mart store would generate between three- and five-hundred jobs and contribute $70,000 in taxes in the first year of operation.  After receiving the report, Graham again solicited an MDOT

planner for help in opposing the proposed store.  In an email that acknowledged that Wal-Mart itself advised that it would create three-hundred jobs paying nearly ten dollars per hour, he asked MDOT, "Do you know of any localities that have ordinances that prohibit 24 hour operation?"

On July 20, 2005, Defendant was advised by Tom Johnston, a local businessman, that an anti-Wal-Mart group called Citizens for Frankenmuth First had been set up, and that Johnston was involved in the group as a Vice-President.  Johnston had operated an IGA store for several years until it was purchased by the Kroger Company, which operates over three-thousand stores in the United States, in 2003.  The Kroger is located on North Main Street, several blocks north of Genesee Street within the Bavarian Mall, which is zoned B-3, highway commercial.

Citizens for Frankenmuth First retained attorney Robert LaBelle to assist in its anti-Wal-Mart efforts.  Its website featured LaBelle's name.  In August 2005, the Frankenmuth City Planning Commission suggested a moratorium on construction of certain new large commercial buildings. An official moratorium, Resolution No. 2005-92, was passed and adopted by Defendant shortly after that meeting, halting the approval process related to the development of any retail facility of at least 70,000 square feet, for a period of 120 days.

On August 25, 2005, Graham attended an anti-Wal-Mart rally sponsored by Citizens for Frankenmuth First.  Even though the moratorium was in effect, Defendant knew from Wal-Mart's Ann Arbor-based engineering firm that Wal-Mart still wanted to purchase Plaintiffs' property to build a 100,000 square-foot store.  In early September 2005, Graham and several City Council members met with attorney LaBelle.

An individual who was known for his anti-Wal-Mart views, transmitted to Graham and Kerns the text of a Maryland ordinance that limited retail establishments to 65,000 square feet.

Later, Graham and Kerns obtained an article from the American Planning Association entitled "Practice Big Box Regulation," which explained some methods by which towns could zone away stores like Wal-Mart.  On September 14, Graham sent an email to Kerns that suggested how such an ordinance could be formulated.

In the days that followed, but before any public hearing on the issue, Graham continued to pursue "size-cap" ordinances as the means of blocking Wal-Mart.  On September 14, 2005, he contacted the Institute for Local Self-Reliance, an anti-Wal-Mart website that sells books entitled, "Big Box Swindle," among others.  He inquired about anti-Wal-Mart ordinances as follows:

> I read your article on store size caps.  My question is: Have any of these communities been sued for establishing these store size caps and if so what were the results?  If we adopt this type of ordinance, does it have a chance of withstanding potential litigation?  Our recently updated community master plan does provide a good foundation for adoption of this type of ordinance.  Our City Council is interested in pursuing this type of ordinance, but there is some hesitancy about it because of the fear of law suits.

The following day, Graham sent an email to Kerns and Johnston concerning the legality of size-cap ordinances.  On September 16, 2005, Graham sent a memorandum to the City Council and others requesting that Defendant not take a public position on the Wal-Mart development in response to a Citizens for Frankenmuth First survey.  On September 27, 2005, Graham first internally introduced the idea of an ordinance capping the size of a retail establishment.  Two days later, Graham introduced LaBelle to the Frankenmuth Ordinance Review Committee ("ORC") and invited LaBelle to attend the meeting with the ORC, scheduled for October 5, 2005.

At the time this occurred, Defendant's only economic development report concerning a Wal-Mart in Frankenmuth was the positive assessment Defendant obtained during the summer of 2005.  On October 5, 2005, Graham sought an opinion from the City's insurer about liability coverage in the event of a lawsuit.  On October 11, 2005, Graham forwarded to members of the ORC

committee a proposed ordinance that would limit store size.  The proposed ordinance was drafted by LaBelle, and his services were paid for by Citizens for Frankenmuth First.  The zoning ordinance would establish a Neighborhood Commercial Overlay Zone, set standards and regulations within the zone, and limit the size of retail establishments to 65,000 square feet.  On October 18, 2005, Wal-Mart made a presentation to Defendant indicating that it was willing to design its store to fit in architecturally with the Bavarian appearance maintained in the historic part of town.

After the first draft of the ordinance was circulated, Graham continued to communicate with LaBelle about the potential Wal-Mart store.  In an email dated October 21, 2005, Graham expressed concern to LaBelle that having the ordinance apply only to the northern end of town was discriminatory and Graham expressed further concern that were the ordinance to be applied city-wide, the established, local businesses on the southern end would object to having a limitation that stopped them from building in the future.  In his email to LaBelle, Graham said:

> The Planning Commission will also have to decide which of the two versions of the 65,000 square foot store ordinance they want to adopt.  As our Ordinance Review Committee was reviewing the findings section at the beginning of the ordinance, we could not see how those findings justified only allowing a building of less than 65,000 square feet north of Genesee Street.  We also felt that in a court of law a judge would view this approach as more even handed because it will be applicable to the entire City.  Having the ordinance only apply north of Genesee is discriminatory to that area of town.  That s why the one version of the ordinance would have to apply to the entire City.

In the same email to LaBelle, Graham said:

> However, the Committee also recognizes that the local businesses who are in the tourist business may object to having this limitation apply to their area of town, i.e., the area south of Genesee.  The example we keep hearing is, What if Cabella s wants to locate a store here?  That s the reason for drafting the ordinance version that applies to the area north of Genesee.  I think this version of the ordinance would be fine if we could all feel comfortable with the justification of why it would only apply to the area north of Genesee.  Up to this point, I don't think we have adequate justification for restricting it to that area.

Graham then created two new drafts of the ordinance, with one draft limiting the store cap size only

to an area north of Genesee Street, and one draft establishing a Commercial Overlay Zone encompassing all properties within Defendant.

On the same day, Graham received an email from Stamiris, which included information that she had received from Professor Kenneth Stone. Dr. Stone is a professor of economics of Iowa State University, and the author of a 1988 study entitled "The Effect of Wal-Mart Stores on Business In Host Towns and Surrounding Towns in Iowa." Dr. Stone was asked by Stamiris for his view on the proposed zoning ordinance. His email response was that store cap restrictions such as those proposed by Graham are very narrow-minded, and that a Wal-Mart in a town like Frankenmuth usually draws a few other national chains such as an office supply store, a chain restaurant, an apparel store, or a short-line furniture store.

The first formal step towards passing the ordinance was to secure its approval by the Planning Commission, a body with nine voting members. Within days of the new language and in advance of the Planning Commission's next scheduled meeting concerning the ordinance, the Frankenmuth DDA and the EDC advised the Planning Commission that they had no position for or against the proposed zoning ordinance.

Graham edited the language for the size cap draft, sent it to LaBelle for comment, and then revised the proposed ordinance again before submitting it to the Planning Council. The following day, Graham incorporated the definition of a building suggested by LaBelle to make it impossible for Wal-Mart to build two 65,000 square foot stores joined by a walkway. Shortly before it was set for a vote by the Planning Commission, Graham explicitly noted that the proposed zoning ordinance should not be written to affect Bronner's:

> We can't restrict this Special Use Permit to CT-PUD districts because we may have a proposed project in another commercial zone such as B-3. The property where Bronners is

located is zoned B-3 and I don't want to have to tell them they can't qualify for a 70,000 square foot addition.

After making edits, Graham consulted with attorneys officially retained by Defendant. Following the attorneys' advice to hire a professional planner, Graham retained Larry Nix, a planner from Grand Rapids. A few days later, Graham again consulted with LaBelle, and expressed concern that the zoning ordinance that would soon come to a Planning Commission vote would affect Bronner's. He said:

> If this ordinance is adopted, what will it mean for existing buildings? Bronner's Christmas Wonderland is currently about 400,000 square feet. If this ordinance is adopted it obviously doesn't have any impact on the existing building, but what if they want to add a 50,000 square foot building addition? Would the new ordinance only apply to the addition or would it apply to the entire building?

On November 16, 2005, Stamiris sent Graham an e-mail notifying him that Johnston was concerned that the zoning ordinance could affect the ability of Kroger to expand its operation. After being assured that Johnston was fine with the ordinance, Graham formally submitted it to the Planning Commission and for public hearing.

The Planning Commission public hearing concerning the size-cap zoning ordinance was scheduled for November 22, 2005. On November 16, 2005, Graham arranged for Nix to meet with two or three of the Planning Commission members in advance of the scheduled public meeting. In an email to Nix, Graham said:

> If you are able to come here for the Planning Commission meeting on Tuesday, would it be possible for you to come an hour early for the purpose of meeting with two or three City Council members so they could hear some of your comments and thoughts about the appropriateness of adopting the 65,000 sq. ft. ordinance and what your thoughts are on potential litigation? There are three Council members that would be well served to hear your comments in a separate meeting so that you could discuss this more freely than you will be able to do at the public hearing. It's quite probable that Wal-Mart will have one or two or three representatives at the public hearing, including a Saginaw attorney they hired to represent them.

A few days before the Planning Commission meeting, to be attended by the public, and in response to concern that the ordinance could affect Bronner's and other businesses in the south end of town, Graham and Kerns, with the input of Nix, decided to shrink the size of the proposed zone to simply exclude the part of the town immediately south of Plaintiffs' property. By this action, Bronner's, the fried chicken restaurants, and the rest of Little Bavaria visited by tourists, continued to be free to add commercial structures or additions of any size.

Graham asked Nix to write a letter to him that would justify, from the planner's perspective, the restrictive ordinance about to be proposed for public hearing. Nix delivered a two-page letter to Graham on November 21, 2005. No economic studies of any kind were performed by Defendant concerning the Wal-Mart, with the exception of the report forwarded by the DDA, which estimated the Wal-Mart would bring between three- and five-hundred jobs to the area. The overlay zone, referred to as CL-PUDOZ, was enacted on December 6, 2005, as Ordinance 2005-10. It exclusively applies to areas that are zoned CL-PUD.

According to Defendant, on January 13, 2006, representatives of Defendant and the Township of Frankenmuth conducted a pre-application meeting under the PUD approval ordinance with Atwell Hicks, a Wal-Mart representative. Following that meeting, on January 27, 2006, Graham wrote a letter to Hicks indicating the deficiencies in their submission and identifying those additional requirements and items that would need to be submitted to Defendant to proceed with the approval process, including a traffic impact study, economic impact study, landscaping plans and compliance with storm water drainage regulations. Hicks was instructed that following submission of the requested items, a second pre-application conference would follow in preparation for formal proceedings of the Planning Commission and City Council. Following the transmittal of the letter,

-12-

Defendant received no further communication from Wal-Mart and Defendant took no formal action with regard to any regulatory approval necessary for a Wal-Mart store on Plaintiffs' property.

II

Defendant moves to dismiss various of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based on standing and ripeness requirements. Rule 12(b)(1) motions can be raised at any time, even after trial and the entry of judgment. Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). When the defendant challenges subject matter jurisdiction through a motion to dismiss, the plaintiff bears the burden of establishing jurisdiction. *Angel v. Kentucky*, 314 F.3d 262, 264 (6th Cir. 2002). In reviewing a 12(b)(1) motion, the court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits.

Motions to dismiss for lack of subject matter jurisdiction can fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack is a challenge to the sufficiency of the pleading itself; in such an attack, the court takes the material allegations of the complaint as true, and construes them in the light most favorable to the nonmoving party. *Id.* (internal citation omitted.) A factual attack challenges the factual existence of the subject matter jurisdiction. On such a motion, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). In reviewing a factual attack on jurisdiction, the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."

-13-

*Ohio Nat'l Life*, 922 F.2d at 325 (internal citations omitted).

Defendant also moves for summary judgment on the merits of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56(c). Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence and draw all reason able inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Mich. Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but

-14-

must make an affirmative showing with proper evidence in order to defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts."  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

Under Rule 56(f) of the Federal Rules of Civil Procedure, if a party opposing a  motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," a district court has discretion to deny the motion, order a continuance, or issue any other just order.  A court should not grant summary judgment "absent *any* opportunity for discovery."  *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231 (6th Cir. 1994). However, a court is not required to allow time for further discovery "if the party does not explain how such discovery would rebut the movant's showing of the absence of a genuine issue of material fact."  *Singleton v. United States*, 277 F.3d 864 (6th Cir. 2002).  Relevant factors include when the party "learned of the issue that is the subject of the desired discovery,"  the potential impact of the desired discovery on the summary judgment ruling, "how long the discovery period lasted," whether the party was "dilatory in its discovery efforts," and whether the party was "responsive to discovery

-15-

requests." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196-1197 (6th Cir. 1995) (internal citations omitted).

### III

Standing is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). A plaintiff must satisfy three constitutional requirements:

> First, the plaintiff must have suffered an 'injury in fact'- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).

In addition to the constitutional requirements, a plaintiff must also satisfy three prudential standing restrictions. *See Coal Operators and Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002). First, a plaintiff must "assert his own legal rights and interests, and cannot rest his claim for relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499 (internal citations omitted). Second, a plaintiff's claim must be more than a "generalized grievance" that is pervasively shared by a large class of citizens. *Coal Operators*, 291 F.3d at 916 (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75 (1982)). Third, in statutory cases, the plaintiff's claim must fall within the "zone of interests" regulated by the statute in question. *Ibid.* "These additional restrictions enforce the principle that, 'as a prudential matter, the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted.' " *Coal Operators*, 291 F.3d at 916 (quoting *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991)). "A plaintiff bears the burden of demonstrating standing and must plead

its components with specificity." *Id.* at 916.

Whether a plaintiff's claims are ripe also affects a federal court's subject matter jurisdiction. "Ripeness is a mixture of Article III concerns about actual cases or controversies and prudential concerns about the appropriate time for a court to make a decision." *Seiler v. Charter Twp. of Northville*, 53 F. Supp. 2d 957, 961 (E.D. Mich. 1999) (quoting *Cmty. Treatment Ctrs., Inc. v. City of Westland*, 970 F.Supp. 1197, 1209 (E.D. Mich. 1997)). "Ripeness is more than a mere procedural question; it is determinative of jurisdiction.  If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Id.* (quoting *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992)).

Relevant to both standing and ripeness is the distinction between "as-applied" and "facial" constitutional challenges to a zoning ordinance.  "An 'as applied' challenge alleges a present infringement or denial of a specific right or of a particular injury in process of actual application of the rule to a particular parcel of land or landowner." *V. Jacobs & Sons v. Saginaw County Dep't of Pub. Health*, 284 F. Supp. 2d 711, 718 (E.D. Mich. 2003) (internal citations omitted).  "A challenge to the validity of an ordinance 'as applied' . . . is subject to the rule of finality, which is concerned with whether the government entity charged with implementing the ordinance has reached a final decision regarding the application of the ordinance to the property at issue." *Id.* (internal citations omitted).  In contrast, a facial challenge alleges that the mere existence and threatened enforcement of the ordinance materially and adversely affects values and curtails opportunities of all property regulated in the market. *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).  Facial challenges are not subject to the finality requirement. *Seiler v. Charter Twp. of Northville*, 53 F. Supp. 2d 957, 963 (E.D. Mich. 1999).

-17-

Defendant contends that the Court lacks subject matter jurisdiction over Plaintiffs' claims for several reasons. First, Defendant contends that all of Plaintiffs' claims are premised on the effect of the ordinance on Wal-Mart rather than on Plaintiffs, contrary to prudential standing requirements. While Plaintiffs do not have standing to bring claims on behalf of Wal-Mart, Defendant aptly concedes that Plaintiffs have standing to raise claims as property owners.

Second, Defendant contends that Plaintiffs do not have standing because they cannot show that there is as a substantial likelihood that their claimed injury, which Defendant characterizes as "the termination of an option agreement to purchase the property as a result of the adoption of Ordinance 2005-10 limiting the size of retail stores in the CL-PUD classification to 65,000 square feet," would be redressed if Plaintiffs prevail. According to Defendant, "it is most likely that Wal-Mart has now focused its efforts on a new location where there is no 65,000 square foot limitation on the size of a retail building." Moreover, Defendant suggests that Plaintiffs cannot obtain redress in the form of monetary damages because they have not alleged a takings claim.

Contrary to Defendant's position, in *Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby*, 470 F.3d 286, 294 (6th Cir. 2006), the Sixth Circuit found that "economic injury is sufficient to confer standing upon a party," with respect to equal protection and due process claims. Plaintiff is not required to bring a takings claims to challenge the zoning ordinance because the zoning ordinance could offend principles of due process and equal protection, without necessarily amounting to a taking. *See, e.g.*, *JGA Dev., LLC v. Charter Twp. of Fenton*, No. 05-70984, 2006 WL 618881, at *6 (E.D. Mich. Mar. 9, 2006) (noting that "[i]t would be possible for Defendant to rezone Plaintiff's property in a way that would violate Plaintiff's due process rights, but not sufficiently decrease the value of the property to support a takings claim"). Plaintiffs could

-18-

potentially recover, for example, the difference between the value of their property had it remained eligible for development by Wal-Mart ($4,000,000), less its present fair market value.  Finally, Plaintiff seeks a declaratory judgment holding the ordinance unconstitutional, which would redress Plaintiffs' injury by eliminating the effect of the ordinance on Plaintiffs' land.

Third, Defendant argues that Plaintiffs' as-applied equal protection and due process claims are not ripe because Defendant has not made a final decision on Wal-Mart's proposed PUD application, since Wal-Mart abandoned its application.[1]  Defendant relies on *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 200 (1985), in which the U.S. Supreme Court found that the plaintiff's due process claim was not ripe because the effect of the zoning ordinance on the plaintiff's property "cannot be measured until a final decision is made as to how the regulations will be applied to [the plaintiff's] property."  In contrast, Plaintiffs rely on *Nasierowski Bros. Investment Co. v. City of Sterling Heights*, 949 F.2d 890, 894 (6th Cir. 1991), in which the Sixth Circuit found that "a procedural due process claim is instantly cognizable in federal court without requiring a final decision on a proposed development from the responsible municipal agency."  Plaintiffs also contend that *Williamson* only applies to due process or equal protection claims when they arise from or are ancillary to a takings claim, which Plaintiffs do not allege.

Plaintiffs are correct that "the type of claim is crucial to determining whether finality is required."  *Williamson*, 473 U.S. at 194.  Ultimately, "if the [claimed] injury is the infirmity of the process, neither a final judgment nor exhaustion [of administrative remedies] is required."

---

[1]  Defendant's motion also states that Plaintiffs' privilege and immunities clause claim is not ripe, however, Defendant did not specifically address the ripeness of that claim in its motion.

*Hammond v. Baldwin*, 866 F.2d 172, 176 (6th Cir. 1989) (internal citations omitted); *JGA*, 2006 WL 618881 (E.D. Mich. Mar. 9, 2006).  To the extent that Plaintiffs' claims challenge "the infirmity of the process," *Hammond*, 866 F.2d at 176, or facially challenge the zoning ordinance, Plaintiffs' claims are ripe.  However, to the extent that Plaintiffs' equal protection and due process claims challenge the zoning ordinance only as it applies to their property, their claims do not meet the finality requirement.  Thus, those claims are not ripe and the Court lacks subject matter jurisdiction over them.

Although Plaintiffs concede that Wal-Mart did not exhaust its remedies because it never completed the necessary application, nor was Wal-Mart contractually obligated to do so, Plaintiffs contend that the finality requirement is met.  Plaintiffs are correct that there is a difference between a finality requirement and an exhaustion requirement:

> The question whether administrative remedies must be exhausted is conceptually distinct . . . from the question whether an administrative action must be final before it is judicially reviewable . . . . While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson*, 473 U.S. at 192-93; *Bannum v. City of Louisville*, 958 F.2d 1354, 1362 (6th Cir. 1992) (stating that "finality" means that "the actions of the city were such that further administrative action by [the plaintiff] would not be productive").

Plaintiffs argue that the finality requirement is met because the record shows that Defendant set out in a series of deliberate and purposeful steps to block the Wal-Mart from being built; had Wal-Mart applied for a variance, the parties' positions would not be better clarified.  However, the City Council and Planning Commission consist of several members and absent any definitive action

-20-

taken by them as a group, evidence of the strength of a single person's point of view (i.e. Graham's) does not adequately show that Defendant would have rejected Wal-Mart's proposal or request for a variance.  Moreover, even if the evidence showed that each individual city official opposed the building of a Wal-Mart, Wal-Mart never even completed an initial application for them to consider as a group.  To determine that Defendant would have rejected an application that was never completed, based on the result of only a preliminary meeting, would be entirely speculative.  Thus, Plaintiffs' claims do not meet the finality requirement, and they may not advance their challenge to the ordinance as applied to their property.

IV

Generally, the zoning of land is a reasonable exercise of government police power.  *Euclid*, 272 U.S. at 386-90.  In *Euclid*, the U.S. Supreme Court held that a zoning ordinance is unconstitutional only when it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."  *Id.* at 395.  The Court considered a zoning ordinance that divided Euclid into six classes of use districts, three classes of height districts, and four classes of area districts.  *Id.* at 380.  The ordinance regulated and restricted "the location of trades, industries, apartment houses, two-family houses, single family houses, etc., the lot area to be built upon, the size and height of buildings, etc."  *Id.* at 379-80.  The plaintiff owned sixty-eight acres of property, portions of which were located in the various zones.  *Id.* at 379, 382.  The plaintiff challenged the zoning ordinance on the ground that it violated his equal protection and due process rights under the Fourteenth Amendment.  *Id.* at 384.  He alleged that the zoning ordinance restricted and controlled the use of its land "so as to confiscate and destroy a great part of its value."  *Id.*  The Supreme Court upheld the zoning ordinance as a valid exercise of the police power and explained:

Building zone laws are of modern origin.  They began in this country about 25 years ago.  Until recent years, urban life was comparatively simple; but, with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities.  Regulations, the wisdom, necessity, and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive.  Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable.

*Id.* at 386-87.  Many types of zoning restrictions are typically permissible, including "fixing the height of buildings within reasonable limits, the character of materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of overcrowding and the like, and excluding from residential sections offensive trades, industries and structures likely to create nuisances."  *Id.* at 388.

The Michigan zoning enabling act, Mich. Comp. Laws § 125.581, et seq., establishes procedures for the enactment, amendment, and administration of zoning ordinances.  The zoning act places discretionary authority to enact a zoning ordinance and to adopt a zoning map with the legislative body of a city or village.  Mich. Comp. Laws § 125.584(4).  Under the zoning act, the legislative body may amend a zoning ordinance by a text change or alter a zoning map through a rezoning.  *Id.*  The legislative body of a city or village may also have the discretionary authority to temper the effect of a zoning ordinance through special land use permits, *Id.* § 125.584a, or planned unit development, *Id.* § 125.584b.  Further, the zoning board of appeals may grant administrative relief from the strict application of the ordinance in the form of land use variances.  *Id.* § 125.585(9).

To the extent that the Court has jurisdiction over Plaintiffs' claims, the Court will now address the merits of Plaintiffs' equal protection, due process, privilege and immunities clause, and

commerce clause challenges to the zoning ordinance enacted by Defendant.

A

Traditionally, to establish an equal protection claim, a plaintiff "must show that [he or] she is a member of a protected class and that [he or] she was intentionally and purposefully discriminated against because of [his or] her membership in that protected class." *Jones v. Union County*, 296 F.3d 417, 426 (6th Cir. 2002) (citing *Boger v. Wayne County*, 950 F.2d 316, 325 (6th Cir. 1991)). In this case, Plaintiffs have not alleged that they are members of a protected class.

Rather, Plaintiffs attempt to establish a "class of one" equal protection claim. A plaintiff who brings a "class of one" equal protection claim must show that (1) it was treated differently from others who are similarly situated and (2) there is no rational basis for the difference in treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Engquist v. Or. Dep't of Agriculture*, - - - U.S. - - - - , 28 S. Ct. 2146, 2153 (2008). "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005) (internal quotations omitted); *Trihealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005) ("To prevail, [plaintiffs] must demonstrate that the differential treatment they were subjected to is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the County's actions were irrational."). *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (finding that a state constitutional amendment lacked a rational basis because the amendment " seems inexplicable by anything but animus toward the class it affects"). By definition, a "conceivable" basis does not even have to have

-23-

been articulated by the decisionmaker at the time of the decision.  *Nordlinger v. Hahn*, 505 U.S. 1, 9 (1992).

Plaintiffs argue that Defendant violated their equal protection rights when it intentionally crafted the reach of the ordinance to treat Bronner's and Johnston's interest in Kroger, as well as other similar properties, more favorably than their interest in their property.  Neither Bronner's nor Kroger is subject to the overlay zone because it applies only to properties zoned CL-PUD, like the Loesels' property.  Kroger and Bronner's are zoned B-3.  Plaintiff contends that it is significant that before the overlay ordinance was passed, Defendant not only chose the draft of the ordinance that would except the CT-PUD, but also checked with Johnston to determine whether the 65,000 square-foot limitation would affect his business.  Additionally, Plaintiff emphasizes the similarities between Wal-Mart and Bronner's:

> Bronner's is a large retailer much like Wal-Mart . . . .  Both stores were located at similar ends of the town, one in the south, the other in the north.  Had the Wal-Mart been built, it would have been the second largest retailer in town, right behind Bronner's.  Both stores had and planned to have large parking lots.  Both would have used the same main street for primary ingress and egress.  The claim that the CL-PUD and overlay ordinance promotes pedestrian traffic in the CT-PUD district, for example, is incompatible with Bronner's boasts that its parking lot 'accommodates 1,250 cars and 50 busses.'

Finally, Plaintiff contends that the 65,000 square-foot limit is an arbitrary limit that was elected solely to exclude Wal-Mart and cites the following email exchange from Graham, the drafter of the ordinance, to LaBelle, as evidence of that fact:

> [H]ow do we justify a specific number? Why does our draft ordinance use the number of 65,000?  Why doesn't it say 70,000 or 80,000 or 90,000 or 73,496? In other words, what basis do we have for whatever number we use?

In contrast, Defendant contends that Plaintiffs' property is not similarly situated to the properties on which Bronner's and other tourist-related businesses are located because those

-24-

businesses are not part of a PUD district.  Moreover, Bronner's and the Kroger store had already

been operating for many years, in B-3 zones, without any detrimental effect on Defendant.

The fact that the Bronner's and Kroger are zoned B-3, rather than CL-PUD does not mean

that they are not similarly situated to Plaintiffs property.  Both Kroger and the Loesels' property are

located north of Genesee Street, next to North Main Street, in an area primarily zoned B-3, highway

commercial.  This area is north of the tourist zone, which is primarily zoned B-2, local business.

Similarly, Bronner's is located south of East Curtis Road (also known as East and West Jefferson),

next to South Main Street, in an area primarily zoned B-3, highway commercial.  This area is south

of the main tourist zone, although a CT-PUD zone is located nearby.  In sum, all three properties

are located outside the main tourist area, next to Main street, in areas primarily zoned B-3.

The more difficult question is whether Plaintiff can prove that "there is no rational basis for

the difference in treatment."  *Olech*, 528 U.S. at 564.  Plaintiffs must prove that enactment of the

overlay zone, "is so unrelated to the achievement of any combination of legitimate purposes that the

court can only conclude that [Defendant's] actions were irrational."  Defendant proffers that the

overlay zone serves the legitimate purposes of maintaining land use stability and the character of

the community.  Indeed, the substance of the ordinance, a size-cap limitation, is a permissible zoning

criterion and is consistent with the "findings of fact and concerns" supporting the ordinance.

Support for the ordinance includes:

> (1) Frankenmuth has traditionally fostered small and locally owned business enterprises and entrepreneurship providing local employment opportunities and revenue expansion. Frankenmuth also is identified by numerous one-of-a-kind businesses in small scale storefronts, which reflect the Community's ethnic and lifestyle characteristics, building scale, architectural style and historical development.

> (2) Because of its unique character, Frankenmuth is renowned throughout Michigan and the Mid-West, and is one of the most popular tourist destinations in Michigan, thereby

contributing to the economic benefits of the Frankenmuth Community's visitor trade.

(3) The unique character of Frankenmuth would be threatened by proposed large scale uses that are incompatible in size and scale with the historic old world character of Frankenmuth and would irreversibly alter its character. These uses would also adversely impact the existing small scale businesses located in Frankenmuth.

(4) Consistent with the City of Frankenmuth and Frankenmuth Township Joint Growth Management Plan, new commercial development should be encouraged in the so called "town center" settings, where small shops are gathered about a central area, with landscaped center features, where walking is encouraged rather than auto traffic, and strip mall developments with large unattractive parking fields are discouraged. Such town center developments are more consistent with the character and tourism goals of Frankenmuth. They promote efficient use of land, promote a safe and comfortable pedestrian scale environment, preserve and enhance the night sky for the enjoyment of a pristine nighttime environment, and encourage excellence in urban design, improvement in the overall Frankenmuth appearance and preserve the wholeness of Frankenmuth's economic base.

(5) Frankenmuth area residents have expressed concerns that current zoning controls are inadequate to: (a) control the size and scale of commercial uses and (b) protect against adverse changes to the unique physical characteristics of the Community, including building and architectural styles.

Compl. Ex. A.

Although the articulated justifications for the ordinance are legitimate, the overlay zone does not appear to serve these interests in a rational manner. In applying the overlay zone exclusively to the CL-PUD zone, Defendant intentionally excluded the main tourist area and the CT-PUD zone, which is intended to cater to tourists, from the size-cap restriction. If the purpose is to maintain land use stability and the character of the community, the main tourist area, that is, the area roughly bounded on the north by Genesee Street and bounded on the south by East Curtis Street, is precisely where the overlay zone would be expected to apply. Similarly, there is no conceivably rational basis for applying the overlay zone to the CL-PUD zone, but not the CT-PUD zone. Both areas are zoned for development, are substantially surrounded by B-3 zoning, and are located beyond the rough bounds of the main tourist area. In sum, it is impossible to conceive of any rational basis to apply the overlay zone exclusively to the CL-PUD zone, yet not the main tourist zone or the CT-PUD

-26-

zone.

In certain situations, a government enactment that is "underinclusive," or "do[es] not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the intended government end," may be invalidated on equal protection grounds. *See generally* Laurence A. Tribe, *American Constitutional Law*, § 16-4, 1446-49 (2d ed. 1988). As the Supreme Court has noted, "nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Ry. Express Agency v. New York*, 336 U.S. 106, 112 (1949). Ultimately, however, the government enactment must be "clearly wrong, a display of arbitrary power, not an exercise of judgment." *Mathews v. DeCastro*, 429 U.S. 181, 185 (1976). On the record advanced, Defendant is not entitled to summary judgment on Plaintiffs' equal protection claim.

## B

The Due Process Clause of the Fourteenth Amendment provides that a person may not be deprived of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Plaintiff claims that enactment of the overlay zone violated both his procedural and substantive due process rights. "Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." *Warren*, 411 F.3d at 708. In contrast, substantive due process is the doctrine that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003) (internal citation omitted). Generally, "[c]itizens have a substantive due process right 'not to be subjected to arbitrary

or irrational zoning decisions.' " *Braun*, 519 F.3d at 573 (quoting *Pearson v. Grand Blanc*, 961 F.2d at 1217).

Both procedural and substantive due process require a constitutionally-protected property or liberty interest. *See Club Italia*, 470 F.3d at 296 ("Importantly, procedural due process rights are only violated when a *protected* liberty or property interest is denied without adequate hearing.") (emphasis in original); *Braun*, 519 F.3d at 573 ("To state a substantive due process claim in the context of zoning regulations, a plaintiff must establish that [] a constitutionally protected property or liberty interest exists . . . ); *Taylor Acquisitions, L.L.C.*, *v. City of Taylor*, No. 07-2242, 2009 WL 415993, at *6 (stating that "insofar as Plaintiff has failed to assert a property interest for purposes of procedural due process, its substantive due process claim also fails"). While the Constitution protects certain property and liberty interests, the Constitution does not actually create or define those property interests. *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). Rather, whether a plaintiff holds a protected property interest depends on "existing rules or on understandings that stem from an independent source, such as state law. . . ." *Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Generally, to create a constitutionally-protected interest, a person must have a "legitimate claim of entitlement." *Roth*, 408 U.S. at 577.

Defendant contends that Plaintiffs do not have a vested interest in the CL-PUD zoning classification without the subsequently enacted overlay zone because they did not obtain a building permit or commence substantial construction before enactment of the overlay zone. Indeed, "[u]nder Michigan law, a landowner does not possess a vested property interest in a particular zoning classification unless the landowner holds a valid building permit and has completed substantial

-28-

construction." *Seguin*, 968 F.2d at 590 (citing *City of Lansing v. Dawley*, 225 N.W. 500 (Mich. 1929) and *Schubiner v. W. Bloomfield Twp.*, 351 N.W.2d 214, 219 (Mich. Ct. App. 1984)); *Dorman v. Twp. of Clinton*, 714 N.W.2d 350, 358-59 (Mich. Ct. App. 2006); *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (stating that "[a] property owner arguably has a property right where the government *rezones* an existing property") (emphasis in original) (citing *Nasierowski*, 949 F.2d at 896).

In response, Plaintiffs generally contend that their protected interest arises from their contract with Wal-Mart because Michigan contract law defines and grants them the power to privately contract to sell their land. Thus, they contend that they have a pre-existing, enforceable contractual right to convey the CL-PUD zoned land to a third party without a subsequent zoning overlay. It is notable, however, that Wal-Mart did not really have any obligations under the contract, and Wal-Mart's purchase of the land was contingent on several factors, including Wal-Mart's ability to build. Thus, Plaintiffs' interest in the contract was merely a contingent interest, rather than a vested one. Plaintiffs cannot establish a constitutionally-protected property interest, thus, their due process claims fail as a matter of law.

Even if Plaintiffs could establish a protected interest, Plaintiffs' procedural due process claim fails for another reason. Plaintiffs contend that their procedural due process claim arises from "Defendant's decision to proceed with the ordinance without a public hearing and to engage in secret meetings before the opportunity for public comment occurred." Indeed, a plaintiff can "prevail on a procedural due process claim by demonstrating that the property deprivation resulted from . . . an established state procedure that itself violates due process rights." *Warren*, 411 F.3d at 709. In *Nasierowski*, the court explained:

Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard. But, when a relatively small number of persons are affected on individual grounds, the right to a hearing is triggered. Falling into that latter category is the situation where, during the amendment process, a governmental unit singles out and specifically targets an individual's property for a zoning change after notice of a general plan of amendment has been published.

949 F.2d at 896 (citing *Harris v. County of Riverside*, 904 F.2d 497, 501-02 (9th Cir. 1990)).

According to Plaintiffs, there was no public hearing because the result of the "public" hearing was pre-determined when there was at least one meeting between Graham, Nix and several Planning Commission members that was allegedly held in violation of the Michigan Open Meetings Act, Mich. Comp. Laws, § 15.261, et seq. The analysis of *JGA Development* is applicable to the facts of this case. In *JGA Development*, the plaintiff argued that the "public" hearing was meaningless because the zoning board was biased against it when five of the seven board members were known to oppose its PUD and one board member had also served on the planning commission and voted to recommend rezoning the property at issue. 2006 WL 618881, at *9. The Court rejected the plaintiff's due process claim based on:

. . . the reality that there are fundamental differences between the rights of a criminal defendant, which are guaranteed by the Constitution, and property rights, which are to some extent subject to the political process. State and local governments have broad authority to regulate an owner's property rights through the political process . . . . Due Process does not require officials to operate in an objective vacuum, i.e., to disregard either their prior political stances or the views of their constituents.

*Id.* at 9-10. Ultimately, the court determined that because the plaintiff "received notice and an opportunity to be heard, its procedural due process claim fails as a matter of law." *Id.* Similarly, in this case Defendant provided Plaintiffs with notice and an opportunity to be heard, regardless of Graham's apparent opposition to Wal-Mart. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' procedural due process claim.

-30-

C

The Privileges and Immunities Clause of the Fourteenth Amendment states that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The clause "prevents a state from discriminating against citizens of other states in favor of its own." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511 (1939). Plaintiffs' claim that the ordinance "interferes with Plaintiffs' rights to engage in a common occupation." Plaintiffs rely primarily on *Wilkerson v. Johnson*, in which the court found that the "freedom to choose and pursue a career, to engage in any of the common occupations of life, qualifies as a liberty interest which may not be arbitrarily denied by the State." 699 F.2d 325, 328 (6th Cir. 1983) (internal citation omitted).

However, *Wilkerson* did not address privilege and immunities clause claims. Moreover, in the *Slaughter-House Cases*, 83 U.S. 36, 78 (1872), the Supreme Court rejected the application of the privileges and immunities clause to the ability to participate in a specific occupation because the right to exercise a trade is a privilege and immunity of the citizens of the State, and therefore left to the state government for security and protection. Thus, Plaintiffs have not identified a right protected by the Privileges and Immunities Clause of the Fourteenth Amendment, and the Court will grant Defendant's motion for summary judgment on this claim.

D

Pursuant to the United States Constitution, Congress has the power to "regulate Commerce . . . among the several States." U.S. Const. art. 1, 8, cl. 3. The Commerce Clause "encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. The Beer Inst. Inc.*, 491 U.S. 324, 326 n. 1, (1989) (internal citations omitted).

-31-

Under a dormant Commerce Clause analysis, state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994).

In analyzing the constitutionality of a law under the dormant Commerce Clause, a court engages in a two-step inquiry:

> (1) The court asks whether the law directly burdens interstate commerce or discriminates against out-of-state interests? *E. Ky. Res. v. Fiscal Court of Magoffin County*, 127 F.3d 532, 540 (6th Cir. 1997).

> (2) If the statute directly discriminates the court must apply the strictest scrutiny. But, if the statute does not directly discriminate, then the court applies a lower level of scrutiny and asks whether the burdens on interstate commerce are clearly excessive in relation to the putative local benefits. This is known as the Pike balancing test. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

In the first step of the inquiry, a statute can discriminate against out-of-state interests in three different ways: (1) facially, (2) purposefully, or (3) in practical effect. *E. Ky. Res.*, 127 F.3d at 540 (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992)).

State laws that discriminate on their face against interstate commerce are presumptively invalid. *Id.* at 99-100. State laws that purposefully discriminate against out-of-state commerce are also presumptively unconstitutional. *Chem. Waste Mgmt. Inc. v. Hunt*, 504 U.S. 334, 344 & n. 6 (1992). However, the burden of establishing that a challenged statute has a discriminatory purpose under the Commerce Clause falls on the party challenging the provision. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). "[W]here other sources, other than the state's own self-serving statement of its legislative intent, indicate the presence of actual and discriminatory purposes, a state's discriminatory purpose can be ascertained from [those] sources." *E. Ky. Res.*, 127 F.3d at 542

-32-

(citing *Chambers Med. Techs. of S. C., Inc. v. Bryant*, 52 F.3d 1252, 1259, 1259 n. 10 (4th Cir.1995)).

Lastly, "[a] statute which has a discriminatory effect, for Commerce Clause purposes, is a statute which favors in-state economic interests while burdening out-of-state interests." *E. Ky. Res.*, 127 F.3d at 543 (citing *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). In other words, "there are two complementary components to a claim that a statute has a discriminatory effect on interstate commerce: the claimant must show both how local economic acts are favored by the legislation, and how out-of-state actors are burdened by the legislation." *E. Ky. Res.*, 127 F.3d at 542. As the United States Supreme Court has noted, "any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (discussing the similarly situated requirement in Commerce Clause cases).

If the provision is discriminatory on its face, in purpose, or in effect, the provision is subject to strict scrutiny under which it is the state's burden to show that the discrimination is narrowly tailored to further a legitimate interest. *Sporhase v. Nebraska*, 458 U.S. 941, 954 (1982); *Lenscrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005) ("If the statute is found to be discriminatory, it is virtually per se invalid and the Court applies the 'strictest scrutiny.' "). For a law to survive strict scrutiny, it must be "demonstrably justified by a valid factor unrelated to economic protectionism," *New Energy Co.*, 486 U.S. at 274 (internal citation omitted), and there must be no "nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 353 (1977).

If the provision is not discriminatory on its face, in purpose, or in effect, the question becomes whether "the burden imposed on [interstate] commerce is clearly excessive in relation to

the putative local benefits." *Pike*, 397 U.S. at 142 (1970). "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* As the Sixth Circuit has noted, "[t]he party challenging the statute bears the burden of proving that the burdens placed on interstate commerce outweigh the benefits that accrue to intrastate commerce." *E. Ky. Res.*, 127 F.3d at 545 (citing *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282 (2d Cir. 1995)).

First, Plaintiff argues that the ordinance has a discriminatory purpose because the evidence shows that the purpose of the ordinance was to insulate local retailers from Wal-Mart, which in practical effect, limits all interstate retailers from competing against local interests. Plaintiff emphasizes reports that were considered by Defendant indicated that the building of a big-box store such as Wal-Mart would result in the loss and downsizing of local businesses. Plaintiff also argues that "local protectionism" is plain from the findings of fact related to the ordinance which include: "(1) Frankenmuth has traditionally fostered small and locally owned business enterprises and entrepreneurship providing local employment opportunities and revenue expansion. Frankenmuth is also identified by numerous one-of-a kind businesses . . . which reflect the Community's ethnic and lifestyle characteristics . . . (2) The unique character of Frankenmuth would be threatened by proposed large scale uses [that] would also adversely impact the existing small scale businesses located in Frankenmuth."

Even if Defendant's purpose was to discriminate against Wal-Mart and "large scale uses," such a purpose cannot be characterized as a purpose to discriminate against all interstate retailers. Thus, Plaintiff cannot show that the ordinance has a discriminatory purpose. Plaintiff also argues

that the ordinance has a discriminatory effect because it discriminates against out-of-state commerce in favor of in-state interests (i.e. Bronner's and the Kroger store) as a result of the 65,000 square foot size cap. However, according to a report, the size cap would still allow at least sixteen of fifty-six national retailers to build a typical store on Plaintiffs' property. Pl.'s Resp. Ex. OO. Thus, Plaintiff has not carried the burden of showing that the law directly burdens interstate commerce facially, purposefully, or in practical effect. *E. Ky. Res.*, 127 F.3d at 540.

Thus, a lower level of scrutiny applies to the ordinance and the question becomes whether "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142 (1970). Here, Plaintiffs "bear[] the burden of proving that the burdens placed on interstate commerce outweigh the benefits that accrue to intrastate commerce." *E. Ky. Res.*, 127 F.3d at 545 (internal citation omitted). Plaintiffs have not met that burden. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' commerce clause claim.

V

In a Rule 56(f) affidavit attached to Plaintiffs' response as Exhibit K, Plaintiffs indicate that they seek to depose the following witnesses: Defendant's City Manager Charles Graham, Defendant's City Clerk Philip Kerns, Wal-Mart personnel, DDA Director Sheila Stamiris, Tom Johnston, Wally Bronner, Larry Nix, and "certain members of the Planning Commission and City Council who voted in favor of the subject ordinance." Plaintiffs expect that "the depositions will support the extensive documentary trail left by the Defendant - - a trail clearly indicating that the subject ordinance was drafted to improperly protect the economic interests of [certain] businesses . . . ." Plaintiffs expect to obtain discovery setting forth "the negative economic effects on interstate commerce prompted by the discriminatory impact of the ordinance (under both the equal protection

-35-

and dormant commerce clause claims) and a comparison of the local retail and wage market in Frankenmuth." The affidavit further indicates that more proof will be forthcoming with respect to the "similarly-situated prong of Plaintiffs' equal protection claim" and "disproving the City's defense of having a rational basis for the subject ordinance."

Plaintiffs also submitted two declarations from their attorneys and a declaration from a "professional economist." The declaration of attorney David J. Szymanski [Dkt. # 23] discusses the relationships between Johnston, who was the leader of Citizens for Frankenmuth First, the Bavarian Mall, where Kroger is located, Defendant, and its officials. The attorney states that further discovery is expected to show that Plaintiffs were treated differently than Johnston, who had an interest that would have been affected by Wal-Mart.

The declaration of attorney Andrew Kochanowski [Dkt. # 20] highlights portions of transcripts of meetings of the Frankenmuth City Planning Commission on November 22, 2005, and the Frankenmuth City Council on December 6, 2005. In the highlighted portion of the November planning commission discussion, participant Art Loeffler states:

> Greg, you got, I think a listing from Sheila or somebody that talked about the size of stores. That listed and went through the whole gamut of the Wal-Mart, the Meijer, and the K-Mart in regard to the square foot, so yeah you would be eliminating those, I guess, cookie cutter retailers that are out there, and yet there's a whole massive list under 65,000 that would fit and probably be welcomed into this community, so the fact is, yeah, there is some limitation on it, but I think as the master plan stated, somewhere along there we decided what we want and what we don't want as far as the size of a facility.

In the highlighted portion of the December meeting, a member of the public stated:

> We understand that big box development would prove financially ruinous to many, many small locally-owned businesses. Drug stores, appliance stores, photographers, jewelers, eye doctors, car repair shops. These are businesses which have provided service with a smile in Frankenmuth for generations, businesses which have a vested interest in this community, businesses which give back, and businesses which care. We understand that big box retailers, while they spin and smile, smile and spin, to make in-roads in a community in the

end care only about the bottom line.

In another highlighted portion, another member of the public stated:

> Honorable Mayor, at one of our town meetings I addressed Mr. Scott (ph) from Wal-Mart. I told him if we –if Wal-Mart comes to Frankenmuth, we have four drug stores in Frankenmuth, I'll be out of business, and my son will be out of business.

Plaintiffs contend that the above excerpts support the dormant commerce clause analysis. The declaration further states that Plaintiffs expect to prove that part of the response to Wal-Mart by the citizens of Frankenmuth was predicated on the fear that minority residents of Saginaw or Buena Vista, Michigan, would work at and frequent the Wal-Mart, in support of their equal protection claim.

The declaration of Patrick L. Anderson, a "professional economist," [Dkt. # 22] does not describe any additional discovery sought by Plaintiffs, but indicates that Anderson expects to prepare a report addressing, inter alia, the valid economic factors for local land use restrictions, how such restrictions apply to the subject ordinance, what is the likely affect of the ordinance on inter- and intrastate commerce, and what information was available to Defendant at the time of the adoption of the ordinance about the likely effects on inter- and intrastate commerce.

First, with respect to Plaintiffs' equal protection claim, there is no justification to delay ruling on Defendant's motion based on Plaintiffs' 56(f) request because the Court has determined that Defendant is not entitled to summary judgment on that claim. Thus, additional discovery relevant to that claim is not necessary for Plaintiff to defend against Defendant's motion.

Second, the discovery that Plaintiffs seek is not material to their due process claims because Defendant is entitled to summary judgment on those claims based on Plaintiffs' inability to establish a constitutionally-protected interest. Third, the discovery that Plaintiffs seek is not relevant to their

-37-

privileges and immunities clause claim because Defendant is entitled to summary judgment on that claim due to Plaintiffs lack of a protected right.  Indeed, Plaintiffs do not indicate that any of the discovery that they seek would be relevant to those claims.

Fourth, and finally, the discovery that Plaintiffs seek is not material to the Court's analysis of their dormant commerce clause claim.  While Plaintiffs appear to seek additional time to prepare an expert report plausibly relevant to their dormant commerce clause claim, Plaintiffs do not identify any discovery from Defendant, or even a third-party, that is necessary to preparation of the report.  Additionally, the information that Plaintiffs propose that the report would contain is essentially information that was already advanced at hearing- namely, that a 65,000 square foot size cap effectively excludes both a certain number of inter- and intrastate retailers.  Based on the above, the Court will deny Plaintiff's Rule 56(f) request.

VI

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 27, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 27, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS