UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD LOESEL, ARTHUR
LOESEL, GAYLE LOESEL, ELAINE
LOESEL, VALERIAN NOWAK,
VALERIAN NOWAK AND ALICE
B. NOWAK TRUST BY VALERIAN
NOWAK,

        Plaintiffs,

                                        Case Number 08-11131-BC

v.                                Honorable Thomas L. Ludington

CITY OF FRANKENMUTH.,

        Defendant.

_____/

**ORDER AND OPINION DENYING DEFENDANT'S MOTION FOR JUDGMENT, OR IN THE ALTERNATIVE FOR A NEW TRIAL OR REMITTITUR; GRANTING IN PART, DENYING IN PART, AND SCHEDULING FOR EVIDENTIARY HEARING IN PART PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT AND ASSESSMENT OF ATTORNEY FEES, INTEREST, AND COSTS; SCHEDULING TELEPHONIC STATUS CONFERENCE; AND DENYING PLAINTIFFS' MOTION TO STRIKE**

Plaintiffs Ronald and Arthur Loesel filed a complaint against Defendant City of Frankenmuth

on March 17, 2008. The Loesels are owners of a tract of land on the northern outskirts of

Frankenmuth. On May 4, 2009, the Loesels filed an amended complaint [Dkt. # 33], joining as

necessary plaintiffs the co-owners of the tract of land, including Gayle and Elaine Loesel, Valerian

Nowak, and The Valerian Nowak and Alice B. Nowak Trust. Collectively, Plaintiffs entered into

an option agreement with Wal-Mart for Wal-Mart to purchase their land for four-million dollars if

it could build one of its stores on the land.

Defendant learned of the contract, became concerned about the impact that a Wal-Mart and

other similar stores would have on Defendant, and eventually adopted a zoning ordinance ("the

ordinance"), which appeared to preclude Wal-Mart from building one of its stores on Plaintiffs' property. The ordinance placed a 65,000 square foot cap on the size of buildings that could be built on property, including Plaintiffs', to which it applied. Wal-Mart abandoned its application to build a store on Plaintiffs' property and the option contract with Plaintiffs. On March 4, 2010, a jury concluded that Plaintiffs proved that Defendant violated their equal protection rights, and determined that Plaintiffs were entitled to recover $3.6 million in damages.

Originally, the Loesels' complaint alleged claims against Defendant based on the Equal Protection Clause, the Due Process Clause, the Privilege and Immunities Clause of the Fourteenth Amendment, and the Commerce Clause. However, on March 27, 2009, the Court granted in part Defendant's motion for summary judgment, leaving Plaintiffs to pursue only a facial equal protection challenge. *See* [Dkt. # 29]. Subsequently, Defendant filed both a motion for reconsideration and a renewed motion for summary judgment addressing the equal protection challenge.

First, in resolving Defendant's initial motion for summary judgment, the Court acknowledged that a zoning ordinance is unconstitutional only when it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). Yet, the Court noted that in certain situations, a government enactment may be invalidated on equal protection grounds if it is "underinclusive," or "do[es] not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the intended government end." *See generally* Laurence A. Tribe, American Constitutional Law, § 16-4, 1446-49 (2d ed. 1988). As the Supreme Court has noted, "nothing opens the door to arbitrary action so effectively as to allow those officials

to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Ry. Express Agency v. New York*, 336 U.S. 106, 112 (1949). Ultimately, to be held unconstitutional, the government enactment must be "clearly wrong, a display of arbitrary power, not an exercise of judgment." *Mathews v. DeCastro*, 429 U.S. 181, 185 (1976).

The Court noted that Plaintiffs did not allege a traditional equal protection claim, because they did not allege that they were members of a "protected class." Rather, Plaintiffs sought to establish a "class of one" claim, which required them to demonstrate that they were treated differently from others who were similarly situated and that there was no rational basis for the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Engquist v. Or. Dep't of Agriculture*, 553 U.S. 591, 601-02 (2008). The Court explained that a " 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren v. City of Athens*, 411 F.3d 697 (6th Cir. 2005) (quotations omitted); *Trihealth, Inc. v. Bd. of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005) ("To prevail, [plaintiffs] must demonstrate that the differential treatment they were subjected to is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the County's actions were irrational."). *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (finding that a state constitutional amendment lacked a rational basis because the amendment " seems inexplicable by anything but animus toward the class it affects"). Although a "conceivable" basis does not need to have been articulated by the decisionmaker at the time of the decision, it should be apparent that a

proposed basis " 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker." *Nordlinger v. Hahn*, 505 U.S. 1, 9, 15 (1992) (quoting *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528-529 (1959)).

The crux of Plaintiffs' argument was that Defendant violated their equal protection rights when it intentionally crafted the reach of the ordinance to exempt Bronner's and Tom Johnston's interest in Kroger, and other similar properties, from the ordinance. Bronner's is a retail store specializing in Christmas ornaments and other merchandise, which is approximately 400,000 square feet. Kroger is a 57,000 square foot grocery store located in the Bavarian Mall, which is itself 107,000 square feet. Neither Bronner's nor Kroger is subject to the ordinance because it applies only to properties zoned CL-PUD (commercial local – planned use development), like the Loesels' property. Kroger and Bronner's are zoned B-3 (highway commercial). Defendant argued that Plaintiffs' property was not similarly situated to the properties on which Bronner's and other tourist-related businesses are located because those businesses are not part of a PUD district. In addition, Bronner's and the Kroger store had already been operating for many years, in B-3 zones, without any detrimental effect on Defendant.

The Court concluded that Defendant did not demonstrate, as a matter of law, that Bronner's and Kroger were not "similarly situated" to Plaintiffs. The fact that the Bronner's and Kroger were zoned B-3, rather than CL-PUD did not mean that they were not similarly situated to Plaintiffs. Both Kroger and the Loesels' property are located north of Genesee Street, next to North Main Street, in an area primarily zoned B-3. This area is north of the tourist zone, which is primarily zoned B-2 (local business). Similarly, Bronner's is located south of East Curtis Road (also known as East and West Jefferson), next to South Main Street, in an area primarily zoned B-3. This area

is south of the main tourist zone, although a CT-PUD (commercial tourist – planned used development) zone is located nearby. In sum, all three properties are located outside the main tourist area, next to Main street, in areas primarily zoned B-3.

The Court also concluded that Defendant did not demonstrate, as a matter of law, that Plaintiffs could not prove that "there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564. The Court noted that the articulated purposes of the ordinance, for example, to maintain land use stability, the historical Bavarian character of the community, and pedestrian accessibility, were legitimate purposes, but concluded that the ordinance did not appear to serve those interests in a rational manner. In applying the ordinance exclusively to the CL-PUD zone, Defendant intentionally excluded the main tourist area and the CT-PUD zone, which is intended to cater to tourists, from the size-cap restriction. If the purpose was to maintain land use stability and the character of the community, the main tourist area is precisely where the ordinance would be expected to apply. Similarly, there was no apparent rational basis for applying the ordinance to the CL-PUD zone, but not the CT-PUD zone. Both areas are zoned for development, are substantially surrounded by B-3 zoning, and are located beyond the approximate bounds of the main tourist area. Thus, the Court concluded that Defendant did not prove, as a matter of law, that there was a rational basis to apply the ordinance exclusively to the CL-PUD zone, yet not the main tourist zone or the CT-PUD zone.

On May 22, 2009, the Court denied Defendant's motion for reconsideration of the equal protection claim. *See* [Dkt. # 36]. Defendant argued that the Court did not accord deference to the City's decision to enact the ordinance, citing *Pearson v. Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992). Defendant contended that the ordinance could not possibly violate Plaintiffs' equal

protection rights because a size-cap limitation is a permissible zoning criterion and the concerns justifying the ordinance are legitimate. The Court reiterated that a zoning ordinance that is intentionally crafted to apply to but a subset of the landowners that the ordinance's purpose would justify raises a legitimate question about the equal application of the ordinance. On the record advanced, it was not apparent that the challenged ordinance served the legitimate interests sought to be advanced in a rational manner.

Defendant also contended that Bronner's and Kroger were not similarly situated to Plaintiffs in relevant, material aspects, when the stores sold different products than Wal-Mart and the properties were zoned differently. Defendant did not explain how any differences between the products to be sold by Wal-Mart and those sold by either Bronner's or Kroger was relevant or material to the enactment of a size-cap ordinance and the equal protection analysis. Additionally, the Court again explained that the fact that the properties are zoned differently and that the requirements and goals of the different classifications are not identical does not mean that the properties cannot be similarly situated. Defendant did not explain how any differences in requirements and goals were material to the "similarly situated" analysis.

Finally, Defendant contended that there was no evidence that the planning commission or city council "acting as a group would have acted out of ill-will towards Wal-Mart." The Court noted that a plaintiff need not demonstrate that "the challenged government action was motivated by animus or ill-will," if the plaintiff can "negativ[e] every conceivable basis which might support the government action." *See Warren*, 411 F.3d at 711 (quotations omitted). Defendant's motion for summary judgment did not demonstrate that Plaintiffs could not negative every conceivable basis supporting the enactment of the ordinance. On the record advanced, a rational basis for the

-6-

application of the ordinance to certain property or zones and not to others was not apparent. Thus, Defendant's motion for reconsideration was denied.

On December 21, 2009, the Court denied Defendant's renewed motion for summary judgment. *See* [Dkt. # 56]. Defendant argued that application of the ordinance to the CL-PUD zone located in the northern part of Defendant rather than to the B-3 and CT-PUD zones was rationally related to legitimate government interests because Defendant designated the southern area, where vacant B-3 and CT-PUD zoned acreage is located, for future intense commercial usages. Defendant further argued that excluding the B-3 zoned areas that include Bronner's and Kroger and the Bavarian Mall from the building size limitation was rationally related to a legitimate government interest because it eliminates the unnecessary creation of nonconforming uses. Defendant argued that this rationale was consistent with Defendant's "Growth Management Plan," which it asserted designates the south end of town for growth and for intense commercial development while the CL-PUD district on the north side of town is designated for development of smaller commercial establishments because of the limited depth of the CL-PUD district and the adjoining developed or planned residential uses.

Defendant relied on its "community planning expert," R. Donald Wortman, who purportedly analyzed the growth and traffic patterns in the area as well as the articulated plans for the growth of the area. In his affidavit, Wortman stated that "the south side of the City is the preferred location for more intense commercial uses due to existing infrastructure and because that area is closer to more populated resident areas and urban markets." Wortman further stated:

9. That the North Main Street location and the Loesel property have limitations for intense commercial development including limited lot size zoned for commercial use, inadequate lot depth, parking deficiencies because of the lot size and depth, constraints for the proposed development due to the planned north-south right-of-way of Haas Street which divides the

Loesel property and lack of corner-lot frontage preferred for intense commercial development.

10. That North Main Street south of Roedel Road is more appropriate for local commercial uses because of the relatively narrow commercial depth of the lot (660 feet), proximity to residential uses and the need to adequately buffer commercial and residential uses.

11. That the CL-PUD and CL-PUDOZ are rationally based and promote the concept of maintaining local commercial uses on North Main Street south of Roedel Road as more intense commercial uses are appropriate near the south side of the City where nearly 300 acres is identified for future commercial uses.

. . .

13. That the City's exclusion of the application of the overlay building size restrictions to B-3 and CT-PUD zones is a legitimate means to allow intense commercial development in appropriate areas of the City and to not create unnecessary non-conforming uses.

Based on the fact that 2007 Michigan Department of Transportation "traffic counts" demonstrated that there is a higher volume of traffic on the southern route leading into the city center rather than the northern route, Wortman appeared to conclude that road capacity is also higher. Wortman also stated that Defendant's "existing infrastructure, including roads, water lines and sewers, has been designed to accommodate growth and development on the south side of the City." Wortman concluded that Plaintiffs' property is more suited to "local commercial" rather than "general commercial" uses based on the narrow depth of the parcel (660 feet), which would require "a non-typical building and parking orientation."

The Court concluded that Defendant did not advance a rational basis to support the ordinance and that no such basis was otherwise apparent. As Plaintiffs emphasized, Defendant's Growth Management Plan contradicted Mr. Wortman's conclusions. Mr. Wortman concluded that the southern end of Defendant was more suitable for intensive commercial development, yet the Growth Management Plan identified the southern end for tourist development, and the northern end for local commercial development, consistent with the designations of CT-PUD and CL-PUD applied to the

respective property located in those areas.  Thus, the Court concluded that there was at least a question of fact as to whether Mr. Wortman's proffered reasoning was rational and denied Defendant's renewed motion for summary judgment.

On March 4, 2010, a jury found that Plaintiffs proved that Defendant violated their equal protection rights, and determined that Plaintiffs were entitled to recover $3.6 million in damages. Now before the Court is Plaintiffs' motion for entry of judgment and assessment of interest, attorney fees, and costs [Dkt. # 96, Apr. 14, 2010].  On May 4, 2010, Defendant filed a response [Dkt. # 101] and Plaintiffs filed supplemental authority [Dkt. # 102]; on May 18, 2010, Plaintiffs filed a reply [Dkt. # 105]; and on May 20, 2010, Defendant filed a sur-reply [Dkt. # 108].  In addition, Plaintiffs filed a supplemental brief [Dkt. # 129] on August 17, 2010, which Defendant opposed in a response [Dkt. # 132] dated August 30, 2010.

Plaintiffs' motion was scheduled for hearing on July 8, 2010, but prior to the scheduled hearing, Defendant filed a motion for judgment or in the alternative for a new trial or remittitur [Dkt. # 110, June 14, 2010].  Plaintiffs filed a response [Dkt. # 120] on July 9, 2010; and Defendant filed a reply [Dkt. # 127] on August 16, 2010.  The Court scheduled both pending motions for hearing on September 13, 2010, but directed the parties to provide supplemental briefing as to whether the Court should declare the challenged ordinance unconstitutional.  Pursuant to the Court's order, Plaintiffs and Defendant filed supplemental briefs on September 1, 2010.  *See*  [Dkt. # 133, 134]. As explained below, Defendant's motion for judgment, a new trial or remittitur will be denied, and Plaintiff's motion for entry of judgment and assessment of interest, attorney fees, and costs will be granted in part, denied in part, and scheduled for an evidentiary hearing in part.

I

Defendant offers five reasons that it is entitled to a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, eleven reasons that it is entitled to a new trial pursuant to Federal Rule of Civil Procedure 59, and one reason that it is entitled to remittitur. As Plaintiffs suggest, many of Defendant's argument simply restate the arguments previously rejected in Defendant's motion for summary judgment, motion for reconsideration, renewed motion for summary judgment, and motions in limine. Nonetheless, they will each be examined briefly here.

A

The standard of review for a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) is governed by the same standard for motions for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). This Court must "direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict" or if there is insufficient evidence to create a genuine issue of fact for resolution by a jury. *Id.* Importantly, the Court "may not weigh the evidence or make credibility determinations, as these are jury functions." *Jackson v. Quanex Corp.*, 191 F.3d 647, 657 (6th Cir. 1999). Stated otherwise, if after viewing the evidence in the light most favorable to the non-moving party, "a reasonable trier of fact could draw only one conclusion," judgment should be granted for the moving party. *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 157 (6th Cir. 1997); *Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006).

First, Defendant contends that its motion for judgment as a matter of law should be granted because Plaintiffs did not advance evidence to negative every conceivable basis for the challenged ordinance. To support this argument, Defendant cites various portions of the trial testimony of Mr.

Wortman, Defendant's "municipal planning expert," and emphasizes that Plaintiffs did not present the testimony of their own planning expert.

In response, Plaintiffs emphasize that "[a] 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d 697 (quotations omitted). Plaintiffs emphasize that they did not have to present their own evidence to negative every "conceivable" basis proposed by Mr. Wortman. Plaintiffs contend that the jury could have rejected Mr. Wortman's testimony because it was internally inconsistent, not based on relevant facts, and contradicted other witness's testimony regarding the zoning issues faced by Defendant.

For example, with respect to Mr. Wortman's opinion that Defendant could have passed the ordinance because the southern end of town was a better place for a Wal-Mart, cross-examination brought out the following facts: (1) Defendant's Joint Growth Management Plan always contemplated building commercial and retail properties north of the river, by Kroger and Plaintiffs' property, not in the southern end of Defendant by the tourist-oriented establishments; (2) Mr. Wortman did not know whether the farm properties in the southern end of Defendant were serviced by a road, who owned them, or whether their owners were interested in using the property for purposes other than farming; and (3) there was only one bridge that could service a Wal-Mart located in the southern end of Defendant, which is the area that hosted thousands of tourists. Plaintiffs contend that the jury could conclude that Mr. Wortman's opinion that a Wal-Mart was better placed in the southern end of Defendant was not "rational," or related to a legitimate governmental interest.

In addition, Plaintiffs suggest that the jury could have rejected Mr. Wortman's testimony because Larry Nix, another defense witness, contradicted Mr. Wortman. Mr. Nix testified that locating a store in the southern end of Defendant was not considered. He testified that he understood that Defendant wanted to put retail properties in the northern end of town, and the tourist properties in the southern end. Mr. Nix could not provide a justification for extending the ordinance only to the northernmost part of the city, in the CL-PUD zone. Plaintiffs' arguments are persuasive, and Defendant is not entitled to judgment as a matter of law on this ground.

Second, Defendant contends that its motion for a judgment as a matter of law should be granted because there was insufficient evidence to support a finding by the jury that other properties were "similarly situated" to the property affected by the ordinance. In response, Plaintiffs highlight that the Court previously concluded that there was a question of fact as to whether Bronner's and Kroger were "similarly situated" in all relevant respects. Moreover, at trial, the jury requested a definition of "similarly situated" during deliberations. Counsel for Plaintiffs and counsel for Defendant provided input on, agreed to, and approved the definition of "similarly situated" that was provided to the jury. *See* [Dkt. # 91] ("Members of the jury: . . . you are instructed that the term 'similarly situated property' refers to the similarity or dissimilarity, which can include locations, conditions, uses of property, or other criteria. Whether properties are similar or not, factually, is a question for you to evaluate and decide."). Plaintiffs emphasize that City Manager Charles Graham admitted that the zoning requirements for Plaintiffs' property, Bronner's and the Bavarian Mall were effectively the same. Plaintiffs' arguments are persuasive, and Defendant is not entitled to judgment as a matter of law on this ground.

Third, Defendant contends that its motion for a judgment as a matter of law should be

granted because there was insufficient evidence to support a finding by the jury that "the City Council as a whole" enacted the challenged ordinance due to "animus or an intention to harm Plaintiffs." In response, Plaintiffs reiterate that where the challenged action is targeted at a single plaintiff, "[a] class of one plaintiff may demonstrate that a government action lacks a rational basis in one of two separate ways—either by negativing every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will," quoting *Warren*, 411 F.3d 697; *Scarborough v. Morgan County Bd. Of Educ.*, 470 F.3d 250 (6th Cir. 2006); *Klimik v. Kent County Sheriff*, 91 F. App'x 396 (6th Cir. 2004). Plaintiffs also cite circumstantial evidence that was introduced at trial that would allow the jury to infer animus or ill-will. For example, no invitations or notices were sent to Plaintiffs concerning a city council meeting that included the City manager and Planning Commission members when the ordinance that would affect Plaintiffs' property was being discussed. Plaintiffs' arguments are persuasive, and Defendant is not entitled to judgment as a matter of law on this ground.

Fourth, Defendant contends that its motion for a judgment as a matter of law should be granted because there was insufficient evidence that the ordinance was enacted "solely because of economic protectionism favoring local merchants and to keep out national retailers." In response, Plaintiffs contend that the trial evidence clearly showed economic protectionism, and that their ability to establish economic protectionism only further supported their claim that Defendant's ordinance was discriminatory and unconstitutional. Plaintiffs contend that courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose, citing *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) ("Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of

invalidity has been erected.") (citations omitted); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 537-38 (1949); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983) (distinguishing between legitimate state purposes and "providing a benefit to special interests"); *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002). Plaintiffs' arguments are persuasive, and Defendant is not entitled to judgment as a matter of law on this ground.

Fifth, Defendant contends that its motion for a judgment as a matter of law should be granted because there was insufficient evidence that Plaintiffs incurred any monetary damages when Plaintiffs did not advance any evidence of a diminution in fair market value of the property as encumbered by the ordinance. In other words, Plaintiffs advanced evidence of the fair market value of the property before the ordinance was enacted, but not after the ordinance was enacted. In response, Plaintiff contends that Defendant waived the argument by not raising the issue prior to trial. Plaintiffs emphasize that Defendant's entire objection to damages in the joint final pretrial order was as follows:

> Defendant maintains that under a "facial challenge" to the ordinance, Plaintiffs' only remedy is invalidation of the ordinance. To the extent Plaintiffs may be entitled to monetary damages, the damages are limited to the amount of the non-refundable deposit or the liquidated damages in the Purchase Agreement as damages for the full purchase price under the option agreement would be speculative since Wal-Mart could terminate the agreement for any reason or no reason at all.

Plaintiffs assert that the Sixth Circuit has repeatedly held that a party waives the right to have an issue decided when it fails to identify the issue to the court in the final pretrial order, citing *Gregory v. Shelby County*, 220 F.3d 433, 442-43 (6th Cir. 2000); *Olsen v. Am. Steamship Co.*, 176 F.3d 891 (6th Cir.1999) (citing *McKinney v. Galvin*, 701 F.2d 584 n.3 (6th Cir.1983)). Plaintiffs also contend that Defendant waived the argument because it never preserved it during its Rule 50(a) motion at trial, citing *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 159-60 (6th Cir. 1997).

-14-

If the argument is not waived, Plaintiffs contend that Defendant's argument should be rejected because the Court cannot weigh the evidence or make credibility determinations. Plaintiffs insist that what Defendant is actually complaining about is that the jury rejected its proposed valuation of the Plaintiffs' land and accepted at least one of the two data points suggested by Plaintiffs. Plaintiffs presented evidence to demonstrate that Plaintiffs' property was appraised for estate tax purposes at $95,000 for the entire property prior to Wal-Mart's offer, and that Defendant bought identical vacant farmland for its future business park which abuts Plaintiffs' land for approximately $10,500 per acre in 2002. On the other hand, Defendant presented evidence that Plaintiffs sold just over two acres of their land to a car dealer for approximately $433,000.

Plaintiffs assert that the jury appears to have accepted the $10,500 per acre figure as the fair market value of Plaintiffs' property prior to the Wal-Mart offer because the jury reduced Plaintiffs' damages from the $4 million offered to Plaintiffs by Wal-Mart to $3.6 million. Thus, Plaintiffs contend that the jury used the proper measure of damages – the difference between the price term contained in the purchase agreement between Wal-Mart and Plaintiffs and the fair market value of Plaintiffs' property.

Furthermore, Plaintiffs presented the testimony of a Wal-Mart Senior Real Estate Manager, David Ewing, tasked with building the Frankenmuth store. His testimony set forth that: (1) Wal-Mart intended to exercise its option to purchase Plaintiffs' property; and (2) that it would have paid the full purchase price upon closing but for the ordinance that limited the size of a building to 65,000 square feet. In addition, Ron Loesel testified that Plaintiffs have not been approached by anyone to buy the property, and have otherwise been unsuccessful in selling the property after the 65,000 square feet restriction was placed upon the property.

Plaintiffs contend that it is enough if evidence shows the extent of damages "as a matter of just and reasonable inference although the result will be only approximate . . . the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party," quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Zenith Radio Corp. v. Hazeltine Research Co.*, 395 U.S. 100 (1969). Plaintiffs' arguments are persuasive, and Defendant is not entitled to judgment as a matter of law on this ground.

B

A district court may order a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Generally, Rule 59 provides district court judges with "broad discretion." *In re Saffady*, 524 F.3d 799, 808 (6th Cir. 2008). A new trial is appropriate when the jury reached "a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940), *Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir. 1989), and *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)). Ultimately, "[t]he governing principle in the Court's acting on a motion for new trial is whether, *in the judgment of the trial judge*, such course is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Saffady*, 524 F.3d at 808 (quoting *Davis by Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 133 (6th Cir. 1990), and adding emphasis).

First, Defendant argues that a "new trial" is warranted because the Court erred in allowing

-16-

the case to reach a jury and failed to grant the legislative body due deference. As Plaintiffs suggest, Defendant revives its motion for summary judgment and again asserts that *Pearson v. Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992), stands for the proposition that the Court should defer to the City's size capping limitation as a permissible zoning criterion. Plaintiffs contends that the documentary record includes the legislative history of the ordinance in question, which was correctly considered throughout this litigation, citing *Village of Arlington Heights v. Metro Hous. Dev. Co.*, 429 U.S. 252, 267-68 (1977). In *Arlington Heights*, the Court explained that "the historical background of the decision," "the specific sequence of events leading up to the challenged decision," "departures from the normal procedural sequence," "substantive departures," and "[t]he legislative or administrative history" may provide circumstantial evidence of discriminatory intent.

As the Court has continually recognized, Defendant needed only advance a "conceivable" rational basis for enactment of the challenged ordinance. *See Nordlinger*, 505 U.S. at 15. Yet, the Court's review "does require that a purpose may conceivably or 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker." *Id.* (quoting *Allied Stores*, 358 U.S. at 528-529). Thus, it was necessary for a finder of fact to determine whether a rationale advanced by Defendant " 'may reasonably have been the purpose and policy' of the relevant governmental decisionmaker," *see id.*, or whether the challenged ordinance is "inexplicable by anything but animus toward the class [Plaintiffs] it affects," *Romer v. Evans*, 517 U.S. 620, 634-35 (1996). Defendant is not entitled to a new trial on this ground.

Second, Defendant argues that a new trial is warranted because the Court applied an incorrect legal standard related to what would constitute "similarly situated" properties. As Plaintiffs suggest, Defendant revives its motion for summary judgment and argues that Bronner's and Kroger are not

similarly situated to Plaintiffs' property in all relevant aspects. Plaintiffs contend that this issue has not been properly preserved because Defendant provided input on, agreed to, and signed off on the definition of "similarly situated" that was provided to the jury after it was requested during deliberations. *See* [Dkt. # 91]. Plaintiffs also emphasize that the Court previously explained as follows:

> The fact that the Bronner's and Kroger are zoned B-3, rather than CL-PUD does not mean that they are not similarly situated to Plaintiffs property. Both Kroger and the Loesels' property are located north of Genesee Street, next to North Main Street, in an area primarily zoned B-3, highway commercial. This area is north of the tourist zone, which is primarily zoned B-2, local business. Similarly, Bronner's is located south of East Curtis Road (also known as East and West Jefferson), next to South Main Street, in an area primarily zoned B-3, highway commercial. This area is south of the main tourist zone, although a CT-PUD zone is located nearby. In sum, all three properties are located outside the main tourist area, next to Main street, in areas primarily zoned B-3.

*See* [Dkt. # 29]. Indeed, Defendant has not explained why the argument is not waived, nor why the Court should reach a different conclusion than it has throughout this litigation. Defendant is not entitled to a new trial on this ground.

Third, Defendant argues that a new trial is warranted because the Court erred in "creating a 'facial challenge' and 'class of one' Equal Protection claim that was not pleaded by Plaintiffs." In response, Plaintiffs assert that they properly plead their equal protection claim and emphasize that the first amended complaint does not differentiate between an as-applied and facial challenge. Plaintiffs assert that the Court did not "create" the claim, but allowed them to pursue it:

> Traditionally, to establish an equal protection claim, a plaintiff "must show that [he or] she is a member of a protected class and that [he or] she was intentionally and purposefully discriminated against because of [his or] her membership in that protected class." *Jones v. Union County*, 296 F.3d 417, 426 (6th Cir. 2002) (citing *Boger v. Wayne County*, 950 F.2d 316, 325 (6th Cir. 1991)). In this case, Plaintiffs have not alleged that they are members of a protected class. Rather, Plaintiffs attempt to establish a "class of one" equal protection claim.

*See* [Dkt. # 29]. Plaintiffs also argue that the joint final pretrial order supersedes any pleadings, which is significant because the document advances Plaintiffs' theory, without challenge by Defendant. Indeed, Defendant does not cite any new legal authority to undermine the "class of one" facial equal protection claim and is not entitled to a new trial on this ground.

Fourth, Defendant argues that a new trial is warranted because admitted evidence of "communication between non-decision makers and others during the development of the ordinance" was "irrelevant and prejudicial more than probative." In response, Plaintiffs emphasize that "[t]he Supreme Court, employing rational basis review, has been suspicious of a legislature's circuitous path to legitimate ends when a direct path is available," quoting *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002). In conducting an inquiry into a municipality's motivation in taking an official action, Plaintiffs suggest that courts should look for guidance to *Arlington Heights v. Metropolitan Housing Development Corp.*, which sets forth a framework for examining discriminatory purpose, citing *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 474 (1997). Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Plaintiffs maintain that the testimony of Mr. Graham (whom Defendant called as its own witness), and his e-mails, were probative of Defendant's actions and were "prejudicial" only in the sense that all losing parties view bad evidence: it made them lose the case. Plaintiffs' argument is persuasive and Defendant is not entitled to a new trial on this ground.

Fifth, Defendant argues that a new trial is warranted because "the jury instructions relating to 'Municipality' failed to provide the proper standard on a rational basis test for a facial challenge to an ordinance and were contrary to law under pronouncements of the U.S. Supreme Court." The

jury instruction provided:

Municipality

(1) The Defendant, the City of Frankenmuth, is a Michigan municipal corporation. The City of Frankenmuth is governed by its elected city council and only acts officially when enacting an ordinance by vote of the council.

(2) City councils may but are not required to explain the purpose or rationale for an ordinance they enact. However, in order to determine whether a particular rationale reasonably provides a basis for an ordinance, you may consider the information reviewed and considered by the City Council, including the City Planning Commission, planning consultants and citizens, and the statements of the council members themselves as they may inform you about the council's collective decision to enact the ordinance.

(3) Generally, it is presumed the City Council, in enacting an ordinance, intends to act in a manner consistent with the United States Constitution, but that presumption may be rebutted by a citizen based upon evidence and empirical data. The presumption of constitutional validity may not be rebutted by mere speculation that is unsupported by evidence or empirical data.

(4) A city, provided that it is otherwise acting lawfully, may amend zoning ordinances whenever it chooses to do so. Landowners do not have any vested property interest in the historical zoning classification of their land unless a landowner has a building permit and has begun substantial construction. In this case, the plaintiffs do not make a claim that they have a vested interest in the historical zoning of the subject property.

(5) Michigan city councils can also consider a wide range of land use, economic, and environmental criteria when choosing to enact an ordinance. They may not, however, act with a significant purpose or rationale to harm select citizens or landowners in order to protect or advance the economic interests of other citizens or landowners.

(6) Finally, municipal corporations are entitled to no different treatment than individual citizens. That is, no more favorably or disfavorably.

In response, Plaintiffs contend that the jury instruction on "Municipality" appropriately adopted and adapted the standard instruction on municipalities from the Western District of Michigan. Plaintiffs assert that the instruction was reflective of the law and properly received by the jury. Plaintiffs emphasize that it is the well-settled law of the Sixth Circuit that "[o]ur inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in law with which to

reach a conclusion." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 357 (6th Cir. 2005) (quoting *United States v. Wells*, 211 F.3d 988, 1002 (6th Cir. 2000)). Plaintiffs contend that Defendant's position on this instruction was too restrictive and an incorrect statement of law because it sought to exclude an instruction on the relevant discriminatory motivations and actions of agents and employees of Defendant.

Defendant's objections stated as follows:

> Municipality – Delete as written. Substitute: In this case the only action to be considered is the vote of the council as a whole in enacting the ordinance setting a building size limit of 65,000 square feet in the CL-PUD zone. Actions of non-decision makers do not bind the municipality.

> We posed this same objection to the February 4, 2010 draft jury instructions. The enactment of the ordinance was a legislative act. The court's instruction would relate to an administrative act and is thus not a proper instruction in this case.

Plaintiffs reiterate that determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Thus, Plaintiffs assert that the Court's jury instruction on "Municipality" adequately informed the jury of the relevant considerations and provided the jury with a sound basis in law with which to reach a conclusion. Plaintiffs' argument is persuasive and Defendant is not entitled to a new trial on this ground.

Sixth, Defendant argues that a new trial is warranted because the jury instructions "improperly allowed the jury to ignore the requirement that Plaintiffs must disprove all conceivable explanations that would justify the ordinance." In response, Plaintiffs contend that the trial evidence demonstrated that Defendant's "conceivable" reasons were "only the best it could cook up after the fact and were contradicted by the evidence of reality." Plaintiffs emphasize that the word

"conceivable" does not mean any reason that can be concocted after the fact, but a reason has some

basis in reality. Plaintiffs' argument is persuasive and Defendant is not entitled to a new trial on this

ground.

Seventh, Defendant argues that a new trial is warranted because the Court "improperly

denied Defendant's motion to quash trial subpoenas to City employees and council members and

impermissibly allowed testimony of motivation for enacting the ordinance. In response, Plaintiffs

contend that this issue was fully addressed in the Court's order denying Defendant's prior motion

to quash trial subpoenas of its employees and council members. Defendant argued that the City

Manager and others should not testify because they were protected by a legislative privilege. The

Court found prior to trial that no legislative privilege existed. Further, Plaintiffs had already taken

their depositions at an earlier point in the litigation, without objection by Defendant.

Plaintiffs contend that Defendant's argument that Plaintiffs' burden of proof was

impermissibly lowered by allowing the testimony of Defendant's employees and council members

at trial is incorrect. Under the "class of one" analysis as construed by the Sixth Circuit, each element

of the equal protection claim involves and even requires a factual inquiry into motivation. Where

the challenged action is targeted at a single plaintiff, "[a] class of one plaintiff may demonstrate that

a government action lacks a rational basis in one of two separate ways—either by negativing every

conceivable basis which might support the government action or by demonstrating that the

challenged government action was motivated by animus or ill-will." *Warren*, 411 F.3d 697.

In denying Defendant's motion to quash, the Court explained:

The anticipated trial testimony of the individuals challenged by Defendant is generally
relevant for purposes of determining whether a rationale advanced by Defendant " 'may
reasonably have been the purpose and policy' of the relevant governmental decisionmaker,"
*see id.*, or whether the challenged ordinance is "inexplicable by anything but animus toward

the class [Plaintiffs] it affects," (citing *Romer v. Evans*, 517 U.S. 620, 634-35 (1996)).

* * *

In determining that a legislative privilege did not apply to state legislators, the *Gillock* Court noted that a specific legislative privilege had not been contemplated by the drafters of Rule 501 although nine other specific privileges had been proposed. 445 U.S. at 367-68 ("Although that fact standing alone would not compel the federal courts to refuse to recognize a privilege omitted from the proposal, it does suggest that the claimed privilege was not thought to be either indelibly ensconced in our common law or an imperative of federalism.").

Indeed, in its reply brief, Defendant acknowledges that "federal privilege applies to a federal question case." For the first time, Defendant presents an argument that this Court should recognize a federal legislative privilege, citing *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) ("Rule 501 of the Federal Rules of Evidence authorizes federal courts to define new privileges by interpreting 'common law principles . . . in the light of reason and experience.' "). Essentially, Defendant contends that the Court should extend the legislative immunity established for federal legislators by the Speech or Debate Clause of the U.S. Constitution, an immunity that federal courts have extended to state and local legislators, to an evidentiary context because a primary benefit of immunity is an effective evidentiary privilege.

A nearly identical argument was rejected in *Gillock*, 445 U.S. at 368 ("Gillock argues that the historical antecedents and policy considerations which inspired the Speech or Debate Clause of the Federal Constitution should lead this Court to recognize a comparable evidentiary privilege for state legislators in federal prosecutions."). While Defendant contends that *Gillock* is easily distinguished because it addressed a federal criminal prosecution of a state legislator, Defendant does not explain why the Court's analysis is not applicable in a civil context.

*See* [Dkt. # 80]. Defendant has not provided any new legal authority to undermine the Court's prior conclusions and is not entitled to a new trial on this ground.

Eighth, Defendant argues that a new trial is warranted because the Court "erred in admitting rebuttal evidence to an expert's opinion testimony on conceivable bases for the [challenged] ordinance, on the ownership of particular CT-PUD parcels as the evidence was not competent, irrelevant to the enactment of any zoning ordinance and highly more prejudicial than probative of rational bases for enactment of the [challenged] ordinance." In response, Plaintiff acknowledges that Defendant objected to David Meyer's trial testimony, but maintains that the Court properly limited

Meyer's testimony to his personal knowledge of factual issues. Plaintiff suggests that this evidence was properly considered by the jury, as Plaintiffs were permitted to rebut Defendant's proffered reasons for enacting the ordinance. Plaintiffs assert that Meyer's testimony was relevant to showing that Defendant did not have a rational basis for enacting the ordinance and that Defendant was not prejudiced by Meyer's limited testimony. Meyer's testimony was limited to identifying the owners of several parcels of property that Wortman stated were more suitable for developing a Wal-Mart, for the purpose of discrediting Wortman's knowledge of the properties in the southern portion of Defendant, properties that Wortman testified were more suitable for developing a Wal-Mart. Plaintiffs emphasize that Defendant has not explained how Meyer's testimony was irrelevant or prejudicial. Plaintiff's argument is persuasive and Defendant is not entitled to a new trial on this ground.

Ninth, Defendant argues that a new trial is warranted because the Court "erred denying Defendant's motion in limine on monetary damages and in giving instructions that the jury could award monetary damages." Plaintiff emphasizes that the Court has already rejected Defendant's position on this issue. Specifically, in denying Defendant's motion in limine, the Court explained:

> At this juncture, Defendant has not provided any legal authority to support the conclusion that Plaintiffs cannot recover money damages. Indeed, it would seem that as long as Plaintiff can establish the necessary causal connection, Plaintiffs can recover money damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992) (explaining that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights") (internal quotations omitted).
> * * *
> Significantly, Mr. Ewing's testimony appears to support the necessary causal connection between Defendant's conduct and the financial harm to Plaintiffs. While Mr. Ewing's credibility can certainly be questioned, particularly based on the other conditions precedent contained in the agreement, this does not mean that the jury could not ascertain damages with a reasonable degree of certainty. Presumably, the harm could simply be determined by determining the difference between the definite price term contained in the agreement between Plaintiffs and Wal-Mart and the value of Plaintiffs' property.

*See* [Dkt. # 73].  At trial, Plaintiffs presented uncontradicted deposition testimony of Mr. Ewing to establish that Wal-Mart intended to exercise its option to purchase Plaintiffs' property, and that it would have paid the full purchase price upon closing but for the enactment of the ordinance. Defendant has not provided any new arguments or additional legal authority to support its position, and is not entitled to a new trial on this ground.

Tenth, Defendant argues that a new trial is warranted because the Court "erred by allowing hearsay testimony of the 'in agricultural use' appraised value of the property for estate tax purposes since the evidence was never disclosed prior to trial and was irrelevant to the true fair market value of the commercially and residentially zoned property."  In response, Plaintiffs acknowledge that Defendant objected to the tax appraisal, but maintain that the Court properly allowed the evidence, and instructed the jury not to consider that amount to be the opinion of another party unless that party was a witness.  Defendant did not object at trial that the tax appraisal was not produced prior to trial, and Plaintiffs contend that the argument is waived.  Plaintiffs further contend that the evidence was properly considered by the jury, as Plaintiffs were permitted to introduce the evidence as a public record.  Finally, Plaintiffs contend that the jury did not use the tax appraisal as a basis for its damage award.  Plaintiffs' argument is persuasive and Defendant is not entitled to a new trial on this ground.

Eleventh, Defendant argues that a new trial is warranted because the Court did not properly instruct the jury that the measure of Plaintiffs' damages "should be the difference between the definite price term in the option agreement between Plaintiffs and Wal-Mart and the fair market value of Plaintiffs' property."  In response, Plaintiffs contend that the jury properly determined Plaintiffs' damages in this case when there is evidence that Defendant bought identical vacant

farmland for its future business park, which abuts Plaintiffs' land, for approximately $10,500 per acre. The jury, in computing the damages, appears to have accepted the $10,500 per acre figure as the fair market value of Plaintiffs' property, and reduced Plaintiffs' damages from the $4 million that Wal-Mart had agreed to pay to Plaintiffs to $3.6 million. Plaintiffs' argument is persuasive and Defendant is not entitled to a new trial on this ground.

C

Finally, Defendant contends that remittitur of the jury's damage award is warranted based on the difference between the price term per acre of the option agreement for Plaintiffs' property and the fair market value of the property. In response, Plaintiffs emphasize that the Sixth Circuit Court of Appeals has explained that "a jury verdict should not be remitted by a court 'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.' " *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 443 (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994). While Defendant argues that Plaintiffs' vacant farmland carried a fair market value of $150,000 per acre, that argument is undermined by the evidence that Defendant itself paid only $10,500 per acre for similar land for its future business park. Plaintiffs' argument that the jury was reasonable in finding $3.6 million to be compensatory for Plaintiffs' loss is persuasive and Defendant is not entitled to remittitur.

II

Next, Plaintiffs' motion for entry of judgment and assessment of interest, attorney fees, and costs raises several issues. First, Plaintiffs' proposed judgment raises the issue of whether the Court should declare the ordinance unconstitutional. Second, Plaintiffs' request for attorney fees raises the issue of what is a reasonable fee amount. Third, Plaintiff's request for costs raise the question

of whether the request is premature. Fourth, Plaintiff's request for interest raises the questions of whether prefiling interest is warranted, in addition to prejudgment interest, and what rate of interest applies. Each will be discussed in turn.

A

Plaintiffs seek a judgment that provides as follows:

This case having come before this Court upon Plaintiffs' Motion for Entry of Judgment and Assessment of Costs, Prejudgment Interest, and Attorney Fees, this case having been previously tried before a jury which on March 4, 2010 rendered its verdict in favor of Plaintiffs, Ronald Loesel, Gayle Loesel, Arthur Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust, against Defendant City of Frankenmuth, the Court having reviewed its file, the Court having heard oral arguments, the Court being fully advised and for good cause shown:

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. The City of Frankenmuth Ordinance, No. 2005-10, is hereby declared unconstitutional and is invalidated in its entirety.

2. A money judgment is hereby entered in favor of Plaintiffs, Ronald Loesel, Gayle Loesel, Arthur Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust, against Defendant, City of Frankenmuth, in the amount of Three Million Six Hundred Thousand Dollars ($3,600,000.00) in compensatory damages for their claim that Defendant, City of Frankenmuth, wrongfully denied Plaintiffs the equal protection of the law as provided for in the Fourteenth Amendment of the United States Constitution.

3. Pursuant to Fed. R. Civ. P. 54(d)(1), Plaintiffs, Ronald Loesel, Gayle Loesel, Arthur Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust, are awarded costs in the amount of _____ ($_____), against, and which shall be paid by, Defendant, City of Frankenmuth.

4. Pursuant to 42 U.S.C. § 1988 this Court awards Plaintiffs, Ronald Loesel, Gayle Loesel, Arthur Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust, attorneys fees in the amount of _____ ($_____), against, and which shall be paid by, Defendant, City of Frankenmuth.

5. Pursuant to M.C.L. § 600.6013, Plaintiffs, Ronald Loesel, Gayle Loesel, Arthur Loesel, Elaine Loesel, Valerian Nowak, and The Valerian Nowak and Alice B. Nowak Trust, are awarded prejudgment interest in the amount of _____ ($_____), against, and which shall be paid by, Defendant, City of Frankenmuth.

6. Pursuant to 28 U.S.C. § 1961, interest shall continue to accrue on the total judgment amount _____ ($_____) through the date it is paid in full.

The Court retains jurisdiction to determine this amount if necessary.

7. This Judgment is a final Order in this matter, disposing of all claims, except those concerning an assessment of post-judgment interest pursuant to 28 U.S.C. § 1961.

*See* [Dkt. # 96-8].

In response to Plaintiffs' motion, Defendant raised the issue of whether the judgment to be entered in this case should provide that the ordinance at issue "is hereby declared unconstitutional and is invalidated in its entirety." Defendant asserts that "[t]he jury did not invalidate the ordinance and was not asked to do so." In reply, Plaintiffs assert that the Court must invalidate the ordinance, because the jury's verdict establishes that the ordinance is unconstitutional. Indeed, Plaintiffs highlight that Defendant has previously argued that Plaintiffs' *only* remedy is a declaration that the ordinance is unconstitutional.

The Court directed further briefing because whether the Court should declare the ordinance unconstitutional is an important question. Whether declaratory relief should be granted is discretionary. *See* 28 U.S.C. § 2201(a); *Adrian Energy Assocs. v. Mich. PSC*, 481 F.3d 414, 421 (6th Cir. 2001) (noting that the Declaratory Judgment Act, 28 U.S.C. § 2201(a) "gives district courts statutory discretion to decide whether to entertain actions for declaratory judgments"). Here, Plaintiffs are entitled to recover $3.6 million in damages pursuant to the jury's verdict, which is arguably premised on the assumption that the ordinance continues to operate to prevent Plaintiffs from selling their property at the price for which they bargained. The Court directed the parties to further address whether it is necessary to invalidate the ordinance to make Plaintiffs whole when invalidation of the ordinance would seem to open the door for Plaintiffs to, in effect, obtain a double recovery through sale of the property. The Court also directed the parties to address what the effects of declaratory relief would be on other property owners who own property subject to the ordinance,

-28-

and whether there are any other property owners that own parcels large enough to be practically affected by the ordinance.

Despite the explicit directive from the Court, in its supplemental brief [Dkt. # 133], Defendant revives the argument that money damages are not available in relation to an equal protection cause of action, citing *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 543 (2005), and contends that the Court should vacate the jury's award of damages. In addition, Defendant contends that it is "inappropriate" to consider whether other property owners are affected by the challenged ordinance, to determine whether to grant declaratory relief, because the trial evidence did not address the issue and parcels that may be too small to accommodate a large building on their own may later be joined together.

In their supplemental brief, Plaintiffs contend that "any chance of double recovery by Plaintiffs is not supported by the record, as no other offers have been made on the property in the five years since the ordinance encumbered it, and all efforts to sell it have failed. There is no indication that another offer will ever be made to Plaintiffs. Further, there is testimony from Wal-Mart that it has abandoned Frankenmuth as a viable project." Plaintiffs insist that even in the remote event that Plaintiffs sell their property at a later date, the most it could fetch would be its fair market value of approximately $10,500 per acre. The jury deducted this amount from the $4 million contract price.

More to the point, Plaintiffs contend that "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future,' " quoting *Johnson v. Capitol City Lodge No. 74, Fraternal Order of Police*, 477 F.2d 601, 603 (4th Cir. 1973); *Bell v. Hood*, 327 U.S. 678, 684-85

(1946) ("And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.").

Plaintiffs emphasize that § 1983 provides in relevant part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"While it is clear from a reading of [Section 1983] that the only remedy it offers is phrased in terms of liability 'to the party injured in an action at law, suit in equity, or other proper proceeding for redress,' it would seem that money damages and/or injunction are the available relief." *Moss v. Jones*, 288 F.2d 342, 344 (6th Cir. 1961).

Thus, Plaintiffs contend that a money judgment works to remedy Defendant's past discrimination, as the jury found that its discriminatory ordinance cost Plaintiffs the sale of a lifetime. *See, e.g.*, *Cmties. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 681 (6th Cir. 2006) ("For plaintiffs, then, § 1983 serves as a vehicle to obtain damages for violations of both the Constitution and of federal statutes."). On the other hand, the Court's invalidation of the ordinance would work to remedy Defendant's discrimination into the future. Currently, Plaintiffs' property is encumbered by an unconstitutional ordinance that is affecting its fair market value. Likewise, the constitutional rights of Plaintiffs and possibly others who own property in the CL-PUD district will remain perpetually violated if the Court declines to issue an order declaring the ordinance unconstitutional and invalid. Like Defendant, Plaintiffs highlight that, if several parcels were merged into a parcel large enough to host a structure in excess of 65,000 square feet, that property

-30-

owner's constitutional rights would be violated by Defendant's discriminatory ordinance. The Court is persuaded by Plaintiffs' arguments that declaratory relief is proper under the circumstances of this case.

III

Plaintiffs seek an attorney fee award pursuant to 42 U.S.C. § 1988, in the amount of $405,672.00, with a fifty-percent enhancement that brings the total to $608,508.00. On August 17, 2010, Plaintiffs filed a supplemental brief, seeking an additional $25,400.00 for attorney fees incurred post trial, with a fifty-percent enhancement bringing the total to $38,100. *See* [Dkt. # 129]. Eastern District of Michigan Local Rule 54.1.2(b) requires the following:

> A motion for an award of attorneys' fees shall be supported by a memorandum brief as to the authority of the court to make such an award . . . The motion shall also be supported by an affidavit of counsel setting out in detail the number of hours spent on each aspect of the case, the rate customarily charged by counsel for such work, the prevailing rate charged in the community for similar services, and any other factors which the court should consider in making the award.

E.D. Mich. LR 54.1.2(b).

The local rule enables the Court to employ the "lodestar" approach to calculate a "reasonable" attorney fee award, which is "the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague*, 505 U.S. 557, 559-60 (1992) (quotations omitted) (noting that the lodestar figure is the "guiding light of our fee-shifting jurisprudence"). The lodestar approach has become the "dominant" approach taken by federal courts because it is "readily administrable, . . . objective, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny*, - - - U.S. - - - -, 130 S. Ct. 1662, 1672 (2010).

In fee-shifting cases in particular, the emphasis on "the prevailing rate charged in the

community for similar services" is directed at "produc[ing] an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Id.* (emphasis in original). Such an award presumptively yields a result that is "sufficient to induce a capably attorney to undertake the representation of a meritorious civil rights case." *Id.*

While there are "rare" and "exceptional" circumstances under which an award may be "enhanced," most relevant factors are "subsumed in the lodestar calculation." *Id.* at 1673; *see, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 898-99 (1984); *Dague*, 505 U.S. at 563 (noting that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed by the lodestar" and "would in effect pay for the attorney's time . . . in cases where his client does not prevail"). Ultimately, the party seeking the attorney fee award has the burden of producing "specific evidence" to prove "that an enhancement is necessary." *Perdue*, 130 S. Ct. at 1673 (citing *Dague*, 505 U.S. at 561, and *Blum*, 465 U.S. at 899, 901-02).

In *Jordan v. City of Cleveland*, 464 F.3d 584, 602 (6th Cir. 2006), the Sixth Circuit described *Wayne v. Village of Sebring*, 36 F.3d 517, 531 (6th Cir. 1994), as "exemplary of our cases stating the methodology for the determination of a reasonable attorney's fee award." *Jordan* quoted the following passage from *Wayne*:

> A starting point is to calculate the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate . . . . The court should then exclude excessive, redundant, or otherwise unnecessary hours. Next, the resulting sum should be adjusted to reflect the "result obtained." This involves two questions: First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Jordan*, 464 F.3d at 602 (quoting *Wayne*, 36 F.3d at 531). Additional factors to be considered,

which may or may not be subsumed by the above in particular cases, include the following factors, which the Sixth Circuit has adopted, and the Supreme Court has cited with approval:

(1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2006); *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3, 434 n.9 (1983).

In their motion, Plaintiffs address each of the twelve factors identified above individually. First, with respect to "the time and labor required," Plaintiffs emphasize that their attorneys undertook significant discovery efforts, including thirty-one discovery subpoenas, FOIA requests, depositions of party and third-party witnesses, and review of many thousands of pages of documents, including zoning codes, the city charter, extensive records of e-mail correspondence among over twenty people, extensive Wal-Mart records, and the records of the Frankenmuth Downtown Development Authority ("DDA") and the Frankenmuth Economic Development Corporation ("EDC"). Plaintiffs' counsel had to respond to Defendant's efforts to join other parties in this case, invocation of privileges and immunity defenses, two motions for summary judgment, and a motion in limine. Additionally, the jury trial lasted seven days over a three-week period.

Second, with respect to "the novelty and difficulty of the question," Plaintiffs emphasize that there are few cases providing guidance on "class of one" equal protection claims. Plaintiffs represent that only two other cases involving a "class of one" equal protection clause violation have been tried in the United States. Plaintiffs also emphasize that "size-cap" ordinances are tough to

defeat on the basis of discrimination because of the extraordinarily high burden of proof placed on the plaintiffs.

Third, with respect to "the skill requisite to perform the legal service properly," Plaintiffs emphasize that their counsel is experienced in complex litigation, *see* [Dkt. # 96-4, 96-5] (affidavits of Plaintiffs' counsel), as is defense counsel.

Fourth, with respect to "the preclusion of other employment by the attorney due to acceptance of the case," Plaintiffs emphasize that their attorneys worked diligently on this case starting in early 2008 and continued until trial concluded on March 4, 2010, precluding them from providing their services to other clients.

Fifth, with respect to "the customary fee," Plaintiffs represent that their counsel's fees (for example, partner-level Kochanowski billing at $400 per hour and associate-level Young billing at $200 per hour) are consistent with fees customarily charged in the metropolitan Detroit area according to recent legal publications and awards in other cases. *See* [Dkt. # 96-9 to 96-19]. Plaintiffs suggest that these fees are lower than the prevailing rates for attorneys of similar skill, experience, and reputation in the community. Plaintiffs do not address the fact that Mr. Kochanowksi's affidavit indicates that he routinely bills commercial clients $350 per hour, rather than $400 per hour.

Sixth, with respect to "whether the fee is fixed or contingent," Plaintiffs contend that in novel or difficult cases, attorney fees may be enhanced to reflect the contingent nature upon which the case was taken. Plaintiffs highlight that in *Northcross v. Board of Education of Memphis City Schools*, the Sixth Circuit explained:

> Perhaps the most significant factor in these cases which at times renders the routine hourly fee unreasonably low is the fact the award is contingent upon success. An attorney's regular

hourly billing is based upon an expectation of payment, win, lose or draw. If he or she will only be paid in the event of victory, those rates will be adjusted upward to compensate for the risk the attorney is accepting of not being paid at all. Some cases under the civil rights statute, those in which the facts are strong and the law clear, pose little risk of losing, and the attorney's normal billing rate will be adequate compensation. Others, in developing areas of law or where the facts are strongly disputed, will require substantial upward adjustment to compensate for the risk . . . The contingency factor is not a 'bonus' but is part of the reasonable compensation to which a prevailing party's attorney is entitled under § 1988.

611 F.2d 624, 638 (6th Cir. 1979). Plaintiffs suggest that their attorneys should be rewarded for "taking a large and uncertain financial risk in the pursuit of justice." To support the proposition that an enhancement is justified, Plaintiffs also cite *Paschel v. Flagstar Bank, FSB*, 279 F.2d 431 (6th Cir. 2002), and *Geier*, 372 F.3d 784. Notably, both of these cases predate the U.S. Supreme Court's recent decision in *Perdue*. In response, Defendants contend that a fifty percent enhancement is not warranted as the complexity of the case, and the fact that the case may have presented unique issues are factors that are already subsumed by the lodestar calculation.

Seventh, with respect to "time limitations imposed by the client or the circumstances," Plaintiffs acknowledge that they did not place any time limitations on their counsel.

Eighth, with respect to "the amount involved and the results obtained," Plaintiffs assert that they seek $608,508.00, that they prevailed on the only claim submitted to the jury, and that the jury awarded Plaintiffs $3,600,000, nearly all of the economic damages sought. Plaintiffs emphasize that Defendant did not make a monetary offer to settle prior to trial.

Ninth, with respect to "the experience, reputation, and ability of the attorney[s]," Plaintiffs again emphasize that their attorneys are very experienced and respected complex litigation specialists.

Tenth, with respect to "the 'undesirability' of the case," Plaintiffs represent that when they

first began seeking legal assistance, they could not find an attorney in the Saginaw area willing to represent them in their suit against Defendant on the basis of a contingent fee arrangement. Plaintiffs assert that the novelty of this area of law and the high burden of proof placed upon Plaintiffs made the case particularly difficult and undesirable to most attorneys.

Eleventh, with respect to "the nature and length of the professional relationship with the client," Plaintiffs acknowledge that their counsel represented them only in connection with this case and beginning in early 2008.

Twelfth, with respect to "awards in similar cases," Plaintiffs represent that they have been unable to locate a case with a jury verdict for a similar amount in a "class of one" equal protection case. They assert that this is a further indicator of the novelty of the case.

More generally, Plaintiffs contend that the number of hours spent by their attorneys on the case is "reasonable." Plaintiffs' attorneys spent a total of 1,190.11 hours prosecuting this litigation, equaling fees in the amount of $405,672.00. Plaintiffs again emphasize that their attorneys undertook significant discovery efforts, including thirty-one discovery subpoenas, FOIA requests, depositions of party and third-party witnesses, and review of many thousands of pages of documents, including zoning codes, the city charter, extensive records of e-mail correspondence among over twenty people, extensive Wal-Mart records, and the records of the DDA and EDC. Plaintiffs' counsel had to respond to Defendant's efforts to join other parties in this case, invocation of privileges and immunity defenses, two motions for summary judgment, and a motion in limine. Additionally, the jury trial lasted seven days over a three-week period.

In response, Defendant contends that it must be provided an opportunity to review Plaintiffs' counsel's billing statements in order to address whether Plaintiffs' claim for attorney fees is

"sufficiently documented," within the meaning of *United Slate, Tile & Composition Roofers v. G&M Roofing*, 732 F.2d 495, 502 n.2 (6th Cir. 1984) ("The documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation."). *See also Hensley*, 461 U.S. at 437 (noting that a fee applicant "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims"). At this juncture, it appears that Plaintiffs have provided the details regarding their fees to the Court, but not Defendant. *See* [Dkt. # 130]. While Plaintiffs assert that in camera review of fee petitions is the standard practice in this district based on the attorney-client privilege, and Defendant contends that Plaintiffs' fee request must be denied if Defendant is not able to review the details, neither party cites any authority to support or undermine either position.

Plaintiffs also specifically contend that the hourly billing rates are "reasonable," according to "the prevailing market rates in the relevant community." *Kramer v. Paul Revere Life Ins. Co.*, No. 04-74362, 2009 WL 2849067, at *7 (E.D. Mich. Sept. 1, 2009) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). Plaintiffs acknowledge that the "relevant community" for purposes of § 1988 attorney fees is generally based on where the district court sits. Plaintiffs insist, however, that rates outside the district court's forum may be used "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *See e.g.*, *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).

Here, Plaintiffs assert that they were unable to find a lawyer or law firm in the greater Saginaw area to represent them in their suit against Defendant. Their search eventually led them

to Sommers Schwartz, P.C., in Southfield, Michigan, an area of the state where attorney fees are customarily higher than in the greater Saginaw area. In particular, Plaintiffs' attorneys from Sommers Schwartz, P.C., located in Southfield, Michigan, charge hourly rates ranging from $150.00 for its associates and up to $400.00 for its senior partners.

Plaintiffs assert that all of these hourly rates are well within the range, or substantially less, than the ordinary fees charged by attorneys in the greater Detroit area with similar skill, experience, and reputation as that of Plaintiffs' attorneys. *See* [Dkt. # 96-9] (sample listing of hourly billing rates for attorneys in the Detroit area in "Largest Law Firms Directory," Michigan Lawyers Weekly (2009)); *May v. City of Detroit*, Nos. 233318, 234966, 2003 WL 21362985, at *12-13 (Mich. Ct. App. June 12, 2003) (affirming award based on $600 per hour fee); *Page v. Globerson*, No. 04-058923-NH, slip op., at *4 (Oakland County Cir. Ct. Sept. 1, 2006) (awarding $475 per hour fee); *Juzba v. State Farm Mut. Auto. Ins. Co.*, No. 04-829-NF, slip op., at *2 (Washtenaw County Cir. Ct. Feb. 8, 2007 (awarding $450 per hour fee); *Worthing v. Reliance Standard Life Ins. Co.*, No. 08-11895, 2009 WL 1798387, at *2 (E.D. Mich. June 22, 2009)(awarding $400 per hour fee); *Karwoski v. Barnebei*, No. 05-1012-NH, slip op., at *2 (Washtenaw County Cir. Ct. Mar. 30, 2007) (awarding $300 per hour fee); *Ruffin v. Metro Cars, Inc.*, No. 05-504665-NI, slip op., at *2 (Wayne County Cir. Ct. Jan. 25, 2007) (awarding $500 per hour fee); *Yousif v. Mercedes-Benz USA, LLC*, No. 2004-061201, 2006 WL 2808565, at *1 (Oakland County Cir. Ct. Sept. 22, 2006) (awarding $300 per hour fee); *Cavanaugh v. Dwamena*, No. 05-972-NH, slip. op., at *2 (Oakland County Cir. Ct. Sept. 23, 2008) (awarding $300 per hour fee); *RDI of Mich., LLC v. Mich. Coin-Op Vending, Inc.*, No. 08-11177, 2010 WL 625397, at *3 (E.D. Mich 2010)(awarding $375 per hour); *Wells v. Corporate Accounts Receivable*, No. 1:07-cv-1214, 2010 WL 455294, at *4 (W.D. Mich. Feb. 8,

2010)(awarding $300 per hour fee).

In response, Defendant contends that Plaintiffs' counsel's hourly rates are well in excess of prevailing market rates for the Saginaw and Bay City areas, and that the rates "should be adjusted to reflect their experience or lack thereof in litigating zoning cases." Defendant insists that when an attorney voluntarily accepts a case outside of his or her home area, they are voluntarily subjecting themselves to the relevant rate in the out of town area, citing *Alcock-Ladd v. Sec. of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). Defendant does not address why there could not be an exception, as Plaintiffs suggest, to this general rule.

Defendant also highlights that the Sixth Circuit and courts in the Eastern District of Michigan have approved the use of the State Bar of Michigan Economics of Law Practice Survey in calculating prevailing rates, citing *Sykes v. Anderson*, Nos. 05-71199, 05-73725, 2008 WL 4776837, at *5 (E.D. Mich. Oct. 31, 2008) (citing, inter alia, *Auto Alliance Intel, Inc. v. U.S. Customs Serv.*, No. 04-1764, 2005 WL 2149673, at *1 (6th Cir. Nov. 23, 2005)). Defendant asserts that the median rate for litigation is $150 per hour in the Saginaw and Bay City area, and that the ninetieth percentile rate is $192.50. Defendant notes that even the rates for South Oakland County and Downtown Detroit are $200-$210 (median) and $283-$277.50 (ninetieth percentile).

Defendant also contends that the awarded rate should be lowered because Plaintiffs' counsel lacks experience in litigating "zoning cases." Defendant suggests that while Mr. Kochanowski's routine fee for "commercial clients" may be $350 per hour (and $300 per hour for Mr. Szymanski), Defendant suggests that this case was not "commercial litigation," but a zoning case. In reply, Plaintiffs emphasize that this was not as much a "zoning case," addressing typical issues such as spot zoning, setback requirements, variances, special use permits, or the like, but an equal protection case

-39-

arising under the Fourteenth Amendment to the U.S. Constitution.

Defendant acknowledges that according to Mr. Szymanski's biography, he had experience in municipal cases, however, Mr. Szymanski has not provided an affidavit (he has left the Sommers Schwartz firm). Defendant suggests that no higher than $200 per hour is appropriate for Mr. Szymanski. Defendant suggests that attorney fees should not be available for Mr. Szymanski's work if he was not directly paid for his work on this case.

Defendant also highlights that Mr. Kochanowski asserts that other attorneys worked on the case and requested rates of $200 per hour. Defendant emphasize that there is no information, other than Mr. Young's personal affidavit, regarding how long these other attorneys have been practicing and what experience they have in litigating "zoning cases." In particular, Ms. Owens, who is no longer at the firm, had five years of experience with the Michigan Court of Appeals as a law and research clerk. Mr. Young's affidavit indicates that he has been licensed since 2009. Defendant asserts that information from the State Bar's member directory indicates the following licensing dates: Owens ( May 10, 2002), Stoops (Nov. 12, 2004), Harmon (Dec. 4, 2006). Defendant insists that "associate attorneys with such extremely limited experience do not warrant a rate of $200 per hour," but only $100 per hour.

In reply, Plaintiffs emphasize that district courts are generally free to look to any market they believe is appropriate to fairly compensate attorneys in individual cases, citing *Louisville Black Police Officers Org. v. City of Louisville*, 700 F.2d 268, 278 (6th Cir. 1983) ("District courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases."). Plaintiffs also highlight that a district court is not required to look only to the State Bar Survey to determine a reasonable

rate, but should rely "on a combination of its own expertise and judgment, the State Bar of Michigan's 'Economics of Law Practice Survey,' other market surveys if necessary, and the attorney's normal billing rate which will often show the market value of the services provided." *Cmties. for Equity v. Mich. High Sch. Athletic Ass'n*, No. 1:98-CV-479, 2008 WL 906031, at *10 (W.D. Mich. Mar. 31, 2008) (citations and quotations omitted); *B & G Mining, Inc. v. Dir., Office of Workers' Comp. Programs*, 522 F.3d 657, 664 (6th Cir. 2008) ("Rates from prior cases can . . . provide some inferential evidence of what a market rate is, just as state-bar surveys of rates provide evidence of a market rate, but themselves do not set the rate."); *Zanon v. Comm'r of Soc. Sec.*, No. 08-15337, 2010 WL 1524143, at *4 (E.D. Mich. Apr. 15, 2010) ("While the State Bar of Michigan Economics of Law Practice Survey provides a starting point in determining a reasonable fee . . . [it alone] is not sufficient.").  Plaintiffs assert that Defendant places undue emphasis on the State Bar of Michigan's Economics of Law Practice Survey, particularly when sixty-percent of responding attorneys reported working in firms employing six or less attorneys, whereas Sommers Schwartz, P.C. employs over forty attorneys.

Importantly, the calculation of fees and costs is a question of fact that often requires an evidentiary hearing.  *See Henson v. Columbus Bank and Trust Co.*, 651 F.2d 320, 329 (5th Cir.1981).  Unless otherwise required by statute or rule, the question of whether to hold an evidentiary hearing to resolve a request for attorney fees is within the discretion of a district court. *Jaynes v. Austin*, 20 F. App'x 421, 427-28 (6th Cir.2001); *see also Bailey v. Heckler*, 777 F.2d 1167, 1171 (6th Cir.1985).  An evidentiary hearing resolving a request for fees and costs is unnecessary "when a record has been fully developed through briefs, affidavits, and depositions." *Robinson v. City of Edmond*, 160 F.3d 1275, 1286 (10th Cir.1998).  Here, an evidentiary hearing is particularly

necessary to establish the number of hours worked by Plaintiffs' counsel and the prevailing rate in the appropriate community, along with whether Plaintiffs' counsel is entitled to invoke the attorney-client privilege. An evidentiary hearing will be scheduled on the attorney fees portion of Plaintiffs' motion.

B

Plaintiffs seek costs in the amount of $43,236.63 pursuant to Federal Rule of Civil Procedure 54(d)(1). In response, Defendant contends that Plaintiffs' request for costs should be denied because it is not sufficiently documented to allow the Court to determine whether the amounts are reasonable and necessary, citing *Pion v. Liberty Dairy, Co.*, 922 F.Supp. 48, 53 (W.D. Mich. 1996) (denying certain witnesses fees and copying costs because their "necessity" was not "adequately documented"). In reply, Plaintiffs assert that it is sufficient that Plaintiffs submitted a bill of costs signed by Mr. Young, along with an affidavit of Mr. Kochanowski stating that he personally reviewed the costs incurred and that each entry is correct and was necessarily incurred.

Defendant also presents seven additional objections. First, Defendant objects to Plaintiffs' expert witness fees. In reply, Plaintiff concedes that these are not recoverable.

Second, Defendant objects that Plaintiffs included numerous expenses that appear to be for a private process server, and contends that these are not taxable under § 1920, citing *Pion*, 922 F.Supp. at 53 (citing *Crues v. KFC Corp.*, 768 F. 2d 230, 234 (8th Cir. 1985)). In reply, Plaintiffs also contend that courts are split on the issue of whether the costs of a private process server are taxable, citing *Hairston Motor Co., v. Northland Ins. Co.*, No. , 1994 WL 874390 (W.D. Va. Sept. 23, 1994) (citing *Tang How v. Edward J. Gerrits, Inc.*, 756 F.Supp. 1540 (S.D. Fla. 1991), aff'd, 961 F.2d 174 (11th Cir. 1992); *Card v. State Farm Fire & Cas. Co.*, 126 F.R.D. 658, 662 (N.D. Miss.

1989), aff'd, 902 F.2d 957 (5th Cir. 1990); *Roberts v. Homelite Div. of Textron*, Inc., 117 F.R.D. 637, 641 (N.D. Ind. 1987)). Plaintiffs explain that "[g]iven the apparent congressional intent to make service of process a taxable item . . . and due to the substitution of private process servers for the U.S. Marshal Service in recent years, . . . the taxation of costs for special process servers is justifiable," quoting *Griffith v. Mt. Carmel Med. Ctr.*, 157 F.R.D. 499, 508 (D. Kan. 1994) (finding private process server fees "taxable only to the extent that they do not exceed the costs that would have been incurred had the Marshal's office effected service, since only the Marshal's fee amount is actually statutorily authorized").

Third, Defendant objects that "witness fees under § 1821 are limited to $40 plus travel expenses at a rate specified by the General Services Office to trial or to a deposition." Defendant also contends that "several of the early subpoenas were for document production however since there is a lack of supporting documentation which witness fees pertain to document production compared to testimony is unknown at this time."

Fourth, Defendant objects that there are entries for mileage for Patrick Driscoll and Harold Cote who are unidentified and the reason for the mileage and travel is not provided. In reply, Plaintiffs identify the two individuals as messenger clerks for Sommers Schwartz, P.C., whose job duties include traveling as necessary to serve and file documents for its attorneys.

Fifth, Defendant objects to a $200 fee for "All Points Appraisal," because "the appraisal was done for estate tax purposes and not for trial," and is therefore not a reasonable and necessary expense.

Sixth, Defendant contends that there is an "unexplained cost of $937.50 to Steven D. Sherbel of West Bloomfield. In reply, Plaintiffs explain that Plaintiffs' counsel met with Dr. Sherbel as a

possible jury consultant.

Seventh, Defendant objects to the cost for overnight lodging during trial for Mr. Young and Mr. Kochanowski. Defendant contends that they had ample time to return to their office to prepare for the next day of trial. Defendant contends that Mr. Young "did not participate at trial other than to sit at counsel table and handle exhibits." Plaintiffs assert that lodging was necessary, as the commute was too far to reasonably expect Plaintiffs' attorneys to prepare for and present their case-in-chief, which lasted approximately four to five trial days. Further, contrary to Defendant's assumption, Mr. Young's lodging was necessary and reasonable, as he was responsible for research, general logistics, courtroom media and exhibits, scheduling witness appearances, organization of files and documents, and client contact.

Notably, costs in this Court are taxed in accordance with Federal Rule of Civil Procedure 54(d)(1) and Eastern District of Michigan Local Rule 54.1. In addition, the Clerk's Office has provided guidance to attorneys through the Bill of Costs Handbook, available online at http://www.mied.uscourts.gov/Rules/BillofCosts200711.pdf. Until the Clerk's Office has taxed costs, review by this Court is premature and Plaintiffs' motion will be denied in part as premature.

## C

Plaintiffs seek prejudgment interest on the judgment amount, their attorney fees, and their costs. With respect to the judgment, 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." In exercising its discretion, Plaintiffs suggest that this Court should consider four factors:

> 1) the need to fully compensate the wronged party for actual damages suffered; 2) considerations of fairness and the relative equities of the award; 3) the remedial purpose of the statute involved; and/or 4) such other general principles as are deemed relevant by the court.

*Beck v. Manistee County*, No. 1:97-CV-533, 2005 WL 2620194, at *7 (W.D. Mich. 2005) (noting that "prejudgment interest is often a component of complete compensation and that in light of § 1983's remedial purpose, interest is often included in the damages award") (citing *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833-34 (2nd Cir. 1992)).  Plaintiffs contend that prejudgment interest on the money judgment is appropriate and equitable, given the remedial nature of § 1983 and the fact that Plaintiffs lost the ability to use the $4,000,000 during the four years since Defendant enacted the challenged ordinance.  Plaintiffs assert that they are also entitled to prejudgment interest on their attorney fees and costs, citing, for example, *Preston v. Thompson*, 565 F.Supp. 294, 297 (N.D. Ill. 1983) ("Every reported case to address the issue has held that interest is available on an award of attorney's fees under § 1988.").

Plaintiffs assert that here, prejudgment interest began accruing from the date Plaintiffs filed their original complaint on March 17, 2008, and will continue to accrue through entry of this judgment.  Plaintiffs assert that the amount of prejudgment interest as of April 14, 2010, based on the damages, the attorney fee award, and cost award portion of the judgment, is $342,754.25.  *See* [Dkt. # 96-6] (Plaintiffs' calculation of prejudgment interest).  Plaintiffs' assert that this calculation is properly made in accordance with Mich. Comp. Laws § 600.6013(8),[1] as opposed to § 1961,[2]

---

[1]  Section 600.6013(8) provides:

Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section.  Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs.  The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

because several federal Courts of Appeals have concluded that "state law governs the calculation of prejudgment interest in section 1983 claims," quoting, for example, *Pressey v. Patterson*, 898 F.2d 1018, 1026 (5th Cir. 1990); *Winter v. Cerro Gordo County Conservation Bd.*, 925 F.2d 1069, 1073 (8th Cir. 1991).

In contrast, Defendant contends that prejudgment interest should be calculated pursuant to the federal framework of § 1961, rather than under the Michigan statute, particularly because jurisdiction in this case is based on a federal question, rather than diversity.  Defendant emphasizes that the Sixth Circuit has found that "the statutory post judgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards," quoting *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998) (citation omitted).  Defendant emphasizes that Plaintiffs rely on case law from the Fifth and Eighth Circuits to support the proposition that the state framework should be used, but that other circuits have found that federal law governs prejudgment interest awards in § 1983 actions.  *See, e.g.*, *Basista v. Weir*, 340 F.2d 74, 86 (3d Cir. 1965).  Because Plaintiff sought relief under federal law, the Court will apply the rate as defined in § 1961.  *See Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 986 (6th Cir. 2000).

Plaintiffs also contend that they should be awarded prefiling interest from the date that Defendant violated Plaintiffs' constitutional rights, citing *Manatuck Assocs. v. Wendt*, No. 3:95CV1006(AHN), 1998 WL 563958, at *1 (D. Conn. Aug. 11, 1998), and *SSC Assocs. Ltd. P'ship v. Gen. Ret. Sys. of City of Detroit*, 534 N.W.2d 160, 162 (Mich. Ct. App. 1995).  Plaintiffs maintain

_____

Mich. Comp. Laws § 600.6013(8).

[2]  Under § 1961(a), "interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield," and compounded annually, § 1961(b).

that Defendant violated their constitutional rights on December 7, 2005, when it enacted the challenged ordinance, and therefore, prejudgment interest should run from that date forward. Plaintiffs assert that as of April 14, 2010, the amount of prefiling and prejudgment interest that had accrued was $943,080.34.

In response, Defendant contends that prefiling interest should not be awarded because it would encourage plaintiffs to wait until just before a statute of limitations runs to file their claims. Defendant also particularly note that *SSC Associates*, 534 N.W.2d 160, is distinguishable from this case because the court found that the defendant held money on an overpayment of interest by the plaintiff that rightfully belonged to the plaintiff. The parties do not particularly address whether prefiling interest is available under the federal framework, as opposed to Michigan law. Nonetheless, the Court concludes that prefiling interest is not appropriate in this case.

Based on the above, Plaintiffs' motion as it relates to interest will be granted in part and denied in part.

### III

Also before the Court is Plaintiff's motion to strike [Dkt. # 128] Defendant's reply in support of its motion for judgment or in the alternative for a new trial or remittitur. After the Court denied Defendant's request to file a twenty-three page reply brief, and struck the lengthy brief from the docket, the Court granted Defendant a short extension of time to file a five-page reply brief. The order was docketed on Wednesday, August 11, 2010, and provided that Defendant's reply brief must be filed by Thursday, August 12, 2010. Defendant did not file the reply brief until Monday, August 16, 2010. Thus, Plaintiff requests that the Court strike the brief as untimely.

Importantly, the Court never intended to provide Defendant with only one day to refile its

reply brief. The order setting the August 12, 2010 deadline was prepared on August 9, 2010. Unbeknownst to chambers, there was a two-day delay in docketing the order. Thus, the three-day time period for refiling the reply brief was inadvertently shortened to just one day. Indeed, had it been known that the order would not be docketed until August 11, 2010, a deadline of August 16, 2010, would have been set for refiling the reply brief. Plaintiffs have suffered no prejudice from the "late" filing of Defendant's reply brief, and the motion to strike will be denied.

IV

Accordingly, it is **ORDERED** that Defendant's motion for judgment, or in the alternative for new trial and remittitur [Dkt. # 110] is **DENIED**.

It is further **ORDERED** that Plaintiffs' motion for entry of judgment and assessment of interest, attorney fees and costs [Dkt. # 96] is **GRANTED IN PART**, **DENIED IN PART**, and **SCHEDULED FOR AN EVIDENTIARY HEARING IN PART**. This order does not terminate the motion.

It is further **ORDERED** that an **EVIDENTIARY HEARING** is scheduled on Plaintiffs' motion [Dkt. # 96] as it relates to the rates and amounts of attorney fees to be awarded Plaintiffs on **December 13, 2010 at 2:00 p.m.**, and that a **TELEPHONIC STATUS CONFERENCE** is scheduled on **November 10, 2010 at 3:30 p.m.** Plaintiffs' counsel is directed to initiate the telephonic status conference.

It is further **ORDERED** that Plaintiffs' motion to strike [Dkt. # 128] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 27, 2010

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 27, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS